**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AMAN BOB SETH, TRUSTEE OF THE TRUST OF AMAN BOB SETH, derivatively on behalf of INTEGRA LIFESCIENCES HOLDINGS CORPORATION,<br><br>      Plaintiff,<br><br>      vs.<br><br>CARRIE L. ANDERSON, PETER J. ARDUINI, GLENN G. COLEMAN, ROBERT T. DAVIS, JR., JAN D. DE WITTE, LEA KNIGHT, STEVE LEONARD, JEFFREY A. MOSEBROOK, RHONDA GERMANY BALLINTYN, KEITH BRADLEY, SHAUNDRA D. CLAY, STUART M. ESSIG, JEFFREY A. GRAVES,  BARBARA B. HILL, LLOYD W. HOWELL, JR., RENEE W. LO, DONALD E. MOREL, JR., RAYMOND G. MURPHY, and CHRISTIAN S. SCHADE,<br><br>      Defendants,<br><br>      and<br><br>INTEGRA LIFESCIENCES HOLDINGS CORPORATION,<br><br>      Nominal Defendant. | **Case No.: 3:25-cv-01665**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Aman Bob Seth, Trustee of the Trust of Aman Bob Smith ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Integra Lifesciences Holdings Corporation ("Integra" or the "Company"), files this Verified Shareholder Derivative Complaint against Carrie L. Anderson ("Anderson"), Peter J. Arduini ("Arduini"), Glenn G. Coleman ("Coleman"), Robert T. Davis, Jr. ("Davis"), Jan D. De Witte ("De Witte"),

Lea Knight ("Knight"), Steve Leonard ("Leonard"), Jeffrey A. Mosebrook ("Mosebrook"), Rhonda Germany Ballintyn ("Ballintyn"), Keith Bradley ("Bradley"), Shaundra D. Clay ("Clay"), Stuart M. Essig ("Essig"), Jeffrey A. Graves ("Graves"), Barbara B. Hill ("Hill"), Lloyd W. Howell, Jr. ("Howell"), Renee W. Lo ("Lo"), Donald E. Morel, Jr. ("Morel"), Raymond G. Murphy ("Murphy"), and Christian S. Schade ("Schade"), (collectively, the "Individual Defendants," and together with Integra, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Integra, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Anderson, Arduini, Coleman, Davis, De Witte, Knight, Leonard, and Mosebrook for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Integra, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Integra's directors and officers from March 11, 2019 through July 28, 2024, inclusive (the "Relevant Period").

2.      Integra is a Delaware corporation that was founded in 1989. Integra conducts its business as a global medical technology company. Among the Company's various products is an engineered collagen technology platform that is used to repair and regenerate tissue, also known as "biologic mesh."

3.      The Company markets and sells its products in over 130 countries through its direct sales force, as well as indirectly through distributors and wholesalers. The Company reports its business in two different segments: Codman Specialty Surgical and Tissue Technologies. The Tissue Technologies segment is based on complex wound surgery, surgical reconstruction, and peripheral nerve repair. Additionally, the Tissue Technologies segment consists of five unique regenerative technology areas.

4.      Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements pertaining to the Company's compliance with current Good Manufacturing Practices ("cGMPs") issued by the United States Food and Drug Administration ("FDA"). For example, on March 11, 2019, the Company filed a Form 8-K with the SEC announcing that it had received a warning letter (the "2019 Warning Letter") from the FDA (the "March 2019 Warning Letter 8-K"). The March 2019 Warning Letter 8-K also informed investors that the Company was working to fix any issues that had been identified by the 2019 Warning Letter, stating:

> The warning letter relates to quality systems issues at our manufacturing facility located in Boston, Massachusetts. The letter resulted from an inspection held at that facility in October and November 2018, and did not identify any new observations that were not already provided in the Form 483 that followed the inspection. ***We take the matters identified in the letter seriously and are in the process of preparing a written response to the letter.*** The Company has provided detailed responses to the FDA as to its corrective actions on a monthly basis and, since the conclusion of the inspection, ***has undertaken significant efforts to remediate the observations and continues to do so.***

*The warning letter does not restrict the Company's ability to manufacture or ship products or require the recall of any products*. . . .

*The Company does not expect to incur material incremental expense for remediation activities*.[1]

5.       The truth regarding the Company's continued failure to comply with cGMPs would not fully emerge until July 29, 2024, when the Company issued a press release (the "Q2 2024 Earnings Release") announcing its financial and operational results for the second quarter of the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"). The Q2 2024 Earnings Release revealed that there were cGMP deficiencies and shipping holds identified within *all* of the Company's facilities. As a result, the Q2 2024 Earnings Release announced that the Company was "[i]mplementing compliance master plan to address quality system and GMP compliance learnings. As a result, the company has initiated temporary shipping holds on certain products that will primarily impact the third quarter."

6.       That same day, the Company filed its quarterly report on Form 10-Q with the SEC (the "Q2 2024 10-Q"). The Q2 2024 10-Q provided further details of the Company's "master plan," stating:

> In Q2 2024, we initiated the planning of a Compliance Master Plan (the "CMP"), a systematic and holistic approach to improving our quality system and Good Manufacturing Practice ("GMP") compliance for the Boston/Braintree sites. While the initial planning has been implemented for the Boston/Braintree sites, the CMP will be expanded across our manufacturing and supply network in the coming months to ensure we can sustain compliance and enable our product supply to match our customer demand. We expect the CMP implementation and engagement to last through 2025.

---

[1] Unless stated otherwise, all emphasis added.

7.    On this news, the price of the Company's stock fell $6.01 per share, or approximately 19.1%, from a close of $31.43 per share on July 28, 2024, to close at $25.42 per share on July 29, 2024.

8.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; (5) the Company did not have effective risk oversight mechanisms in place; and (6) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the Company's Equity Incentive Plan (the "2024 Amendment to the Equity Incentive Plan"). As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.    Moreover, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping combined personal profits of approximately $41.8 million.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), two of its former Chief Executive Officers ("CEO"), its former Chief Operating Officer ("COO"), its EVP and President of Tissue Technologies, its EVP and CFO, its Vice President, Global Operations and Supply Chain, and its Principal Accounting Officer to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. §

78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## **PARTIES**

### **Plaintiff**

17.     Plaintiff is a current shareholder of Integra. Plaintiff has continuously held Integra common stock at all relevant times.

### **Nominal Defendant Integra**

18.     Integra is a Delaware corporation with principal executive offices at 1100 Campus Road, Princeton, New Jersey 08540. Integra's common stock trades on the Nasdaq Global Market ("NASDAQ") under the symbol "IART."

### **Defendant Anderson**

19.     Defendant Anderson served as the Company's EVP and CFO from June 2019 until February 2023.

20.    The Schedule 14A the Company filed on April 8, 2022 (the "2022 Proxy Statement") stated the following about Defendant Anderson:

*CARRIE L. ANDERSON,* is Integra's Executive Vice President and Chief Financial Officer. Ms. Anderson joined Integra in June 2019 and brings a wealth of financial experience working for large, diversified organizations operating in competitive environments. Prior to joining Integra, she was vice president and controller of Dover Corporation. In this role, Ms. Anderson provided financial leadership for a $1 billion business segment spin-off from Dover. Previously, she was CFO of Dover's Engineered Systems, where she secured the build-out of new digital printing growth platform for Dover through multiple acquisitions. Ms. Anderson joined Dover in October 2011 as CFO of Dover Printing and Identification. Prior to Dover, Ms. Anderson spent six years as vice president and CFO of Delphi Product & Service Solutions, a division of Delphi Corporation. While at Delphi, she also held finance leadership positions at three other global operating divisions of Delphi, as well as treasury experience at both Delphi and General Motors, including director, investor relations, at Delphi Corporation. Ms. Anderson was part of Delphi's first investor relations group providing leadership during Delphi's initial public offering, following the spin-off from General Motors. Ms. Anderson started her career with General Motors. Ms. Anderson is a member of the board of directors for Embecta Corporation, following its spin-off of Becton Dickinson's diabetes business. Ms. Anderson graduated from Purdue University with a Bachelor of Science degree in chemical engineering and earned her M.B.A. from Ball State University.

**Defendant Arduini**

21.    Defendant Arduini served as the Company's CEO and a director from January 2012 until December 2021. Defendant Arduini also served as President and COO of the Company from October 2010 until December 2011.

22.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Arduini made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| September 6, 2019 | 250,000 | $60.55 | $15,137,500 |

| February 26, 2020 | 32,316 | $55.68 | $1,799,355 |
|---|---|---|---|

Thus, in total, before the fraud was exposed, Defendant Arduini sold 282,316 shares of Company stock on inside information, for which he received approximately $16.9 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.    The Schedule 14A the Company filed on April 9, 2021 (the "2021 Proxy Statement") stated the following about Defendant Arduini:

> *PETER J. ARDUINI* is Integra's President and Chief Executive Officer and a director. He joined Integra in November 2010 as President and Chief Operating Officer and was appointed Chief Executive Officer and a director in January 2012. Before joining Integra, Mr. Arduini was corporate vice president and president of Medication Delivery, Baxter Healthcare, from 2005 to 2010. Mr. Arduini was responsible for a $4.8 billion global division of Baxter focused on inpatient pharmaceuticals and devices. Prior to that, he worked for 15 years in a variety of management roles for domestic and global business for General Electric Healthcare, culminating in leading the global functional imaging business. Mr. Arduini currently serves on the board of directors of Bristol-Myers Squibb Company, where he is a member of the audit committee and the compensation and management development committee. He serves on the board of directors of ADVAMED, the Advanced Medical Technology Association, the Medical Device Innovation Consortium, and the National Italian American Foundation. He also serves on the board of trustees of Susquehanna University. Mr. Arduini received his bachelor's degree in marketing from Susquehanna University and a master's in management from Northwestern University's Kellogg School of Management. Mr. Arduini is 56 years old.

**<u>Defendant Coleman</u>**

24.    Defendant Coleman served as the COO of the Company from June 2019 until September 2022. Defendant Coleman also previously served as the Corporate Vice President and CFO of the Company from May 2014 until June 2019.

25.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Coleman made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| June 28, 2019 | 3,650 | $55.00 | $200,750 |
| April 24, 2019 | 3,500 | $57.50 | $201,250 |
| August 11, 2020 | 5,000 | $52.27 | $261,350 |
| March 29, 2021 | 15,500 | $68.50 | $1,061,750 |
| April 9, 2021 | 12,500 | $70.00 | $875,000 |
| April 14, 2021 | 4,002 | $70.50 | $282,141 |
| April 16, 2021 | 25,658 | $71.50 | $1,834,547 |
| November 2, 2021 | 4,275 | $74.00 | $316,350 |
| April 4, 2022 | 6,628 | $66.04 | $413,939 |

Thus, in total, before the fraud was exposed, Defendant Coleman sold 80,713 shares of Company stock on inside information, for which he received approximately $5.4 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26.     The 2022 Proxy Statement stated the following about Defendant Coleman:

*GLENN G. COLEMAN* is Integra's Executive Vice President and Chief Operating Officer. Mr. Coleman oversees Integra operations and a majority of Integra's talent force, including clinical, R&D, manufacturing and quality while also leading our international team. Prior to his promotion in June 2019 to Chief Operating Officer, he acted as the Company's Chief Financial Officer and was responsible for the finance department, including accounting and financial reporting, budgeting, internal audit, tax, treasury, investor relations, and information technology while also leading our international business. Prior to joining the Company in May 2014 as Corporate Vice President and Chief Financial Officer, he spent 25 years in financial management positions with leading global businesses, including serving as vice president for finance and corporate controller at Curtiss-Wright Corporation. He also worked at Alcatel-Lucent in various finance executive leadership positions. Mr. Coleman began his career at PricewaterhouseCoopers

LLP. Mr. Coleman received his B.S. degree from Montclair State University and has also been a CPA in New Jersey for more than 25 years.

**Defendant Davis**

27.     Defendant Davis has served as EVP of the Company, and President of the Tissue Technologies division since March 2020. Defendant Davis has also served as the Company's Corporate Vice President and President of the Orthopedics and Tissue Technologies division since December 2016.

28.     The Schedule 14A the Company filed on April 4, 2024 (the "2024 Proxy Statement") stated the following about Defendant Coleman:

> **Robert T. Davis, Jr.** is Integra's Executive Vice President, President, Tissue Technologies. Mr. Davis is responsible for the management of the Tissue Technologies' global division. His responsibilities include leadership of sales, commercial operations, marketing and strategy, product development, regulatory affairs, quality assurance, manufacturing services and repair, business development of the regenerative tissue portfolio of products. Mr. Davis joined Integra in July 2012 as President of the global neurosurgery business and was appointed Integra's Corporate Vice President in December 2012 and President — Specialty Surgical Solutions in 2014. He brings more than 25 years of executive management experience in the global healthcare industry. Prior to joining Integra, Mr. Davis was the general manager for the global anesthesia & critical care business at Baxter Healthcare and held various general management positions at GE Healthcare in the areas of interventional therapeutics, cardiovascular imaging and diagnostic ultrasound.

**Defendant De Witte**

29.     Defendant De Witte served as the Company's President, CEO, and as a director from December 2021 until January 2025.

30.     The 2024 Proxy Statement stated the following about Defendant De Witte:

Mr. De Witte is Integra's President and Chief Executive Officer. He commenced service as President and Chief Executive Officer and a director in December 2021. Mr. De Witte has an extensive track record in the global healthcare industry spanning more than two decades. Prior to joining Integra, Mr. De Witte served as chief executive officer of Barco N.V. from 2016 to August 2021. At Barco, he created shareholder value through digital innovation and new product development,

commercial acceleration, international market growth and operational excellence. Prior to Barco, Mr. De Witte spent 17 years in senior-level leadership roles at GE, including as president and CEO of GE Global Healthcare IT. Before GE, Mr. De Witte spent five years in strategic consulting at McKinsey and three years in operations at Procter & Gamble.

**Defendant Knight**

31.     Defendant Knight has served as the EVP and CFO of the Company since June 2023.

32.     The 2024 Proxy Statement stated the following about Defendant Knight:

**Lea Knight** is Integra's Executive Vice President and Chief Financial Officer. Ms. Knight joined Integra in June 2023 and is responsible for overseeing accounting and financial reporting, budgeting, internal audit, tax, treasury, investor relations and information systems. Prior to joining Integra, Ms. Knight served as the executive vice president of business finance for Booz Allen Hamilton from September 2022 until June 2023, where she was responsible for providing strategic and financial leadership to their business sectors. Prior to her role at Booz Allen Hamilton, Ms. Knight worked for Johnson & Johnson for over 18 years, where she held various financial roles of increasing responsibility, including the chief financial officer of Johnson and Johnson's North America pharmaceuticals business from September 2021 through July 2022. Ms. Knight started her career in public accounting at Arthur Andersen LLP where she managed audit engagements and helped to stand-up the firm's Healthcare Consulting and Mergers & Acquisitions practices for the Philadelphia office.

**Defendant Leonard**

33.     Defendant Leonard has served as the Company's Vice President, Global Operations and Supply Chain since August 2020. Defendant Leonard also previously served as the Company's Senior Vice President of Operations from May 2019 until August 2020.

**Defendant Mosebrook**

34.     Defendant Mosebrook has served as the Company's Principal Accounting Officer since 2017 and as Senior Vice President, Finance since January 2020.

35.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mosebrook made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| March 2, 2021 | 1,058 | $68.70 | $72,684 |
| August 2, 2022 | 437 | $56.77 | $24,808 |
| December 8, 2022 | 279 | $56.22 | $15,685 |

Thus, in total, before the fraud was exposed, Defendant Mosebrook sold 1,774 shares of Company stock on inside information, for which he received approximately $113,178 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.     The 2024 Proxy Statement stated the following about Defendant Mosebrook:

**Jeffrey Mosebrook** is Integra's Senior Vice President, Finance. Mr. Mosebrook also serves as Integra's Principal Accounting Officer. He was appointed Principal Accounting Officer in October 2017. From February 2023 to June 2023, Mr. Mosebrook also served as our Principal Financial Officer. Mr. Mosebrook joined Integra in 2006 through Integra's acquisition of Miltex, Inc. where he served as a financial reporting manager. Since joining Integra, he has served in a number of managerial positions with increasing responsibilities. In May 2010, he was named instruments Group Controller and went on to be named Group Controller, US in March 2012. In September 2014, Mr. Mosebrook was named as Vice President, Corporate Controller. Prior to Miltex, Inc., Mr. Mosebrook spent four years at Beard Miller Company, LLP (now known as Baker Tilly US, LLP) in various accounting roles.

**Defendant Ballintyn**

37.     Defendant Ballintyn served as a Company director from January 2019 until May 2022.

38.     The 2021 Proxy Statement stated the following about Defendant Ballintyn:

*RHONDA GERMANY BALLINTYN* has been a director of the Company since January 2019. Ms. Germany Ballintyn formerly served as corporate vice president, chief strategy and marketing officer for Honeywell International, Inc. Prior to that, she served as vice president, partner, board member and member of the board's personnel committee for Booz Allen Hamilton. In addition, she held various management roles with Union Carbide and Chem Systems Inc. Ms. Germany

Ballintyn serves on the board of directors of Univar, Inc. where she is a member of the audit committee and chairs the nominating and corporate governance committee. She also serves on the board of directors for Aegion Corporation, a gas and water pipeline company, where she serves on the nominating and corporate governance committee and the compensation committee, Hypertherm, Inc., a private manufacturer of industrial cutting solutions, and Zapata Computing, a quantum computing venture-backed start-up. She earned a Bachelor's degree in chemical engineering from the University of Michigan and an MBA in finance from the University of Connecticut. Ms. Germany Ballintyn is 64 years old.

**Defendant Bradley**

39.    Defendant Bradley has served as a director of the Company since 1992. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee and Finance Committee.

40.    The 2024 Proxy Statement stated the following about Defendant Bradley:

Dr. Bradley has been a consultant to a number of business, government and international organizations. Dr. Bradley was formerly a visiting professor at the Harvard Business School, Wharton and UCLA, a visiting fellow at Harvard's Center for Business and Government and a professor of international management and management strategy at the Open University and Cass Business School, U.K. Dr. Bradley taught at the London School of Economics and was the director of the School's Business Performance Group for more than six years. Dr. Bradley was formerly an adviser to RPH Capital, Canada.

**Defendant Clay**

41.    Defendant Clay has served as a director of the Company since 2021. She also serves as a member of the Audit Committee.

42.    The 2024 Proxy Statement stated the following about Defendant Clay:

Since 2021, Ms. Clay has served as the global vice president of finance at Beam Suntory, Inc., a global premium spirits company, where she is responsible for enterprise-wide financial planning and analysis and leads the integration of the short-, mid-, and long-term planning processes to optimize resource deployment. Prior to Beam Suntory, Ms. Clay was a managing director in the commercial banking group at JP Morgan Chase. Ms. Clay also spent 13 years in leadership roles within the healthcare industry in the United States and internationally. She served as chief financial officer for Australia, Canada, and Europe at Eli Lilly and Company and spent a decade at Medtronic in a variety of leadership roles in the

U.S. and abroad, including as chief financial officer for the cardiovascular group for Western Europe and Canada. Ms. Clay began her career in accounting and financial analytics at Allstate Insurance Company.

**Defendant Essig**

43.     Defendant Essig has served as a director of the Company since 1997, and as the Company's Executive Chairman since 2012. Defendant Essig also serves the Chair of the Quality Committee.

44.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Essig made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| May 12, 2020 | 2,087 | $52.07 | $108,670 |
| May 26, 2020 | 46,807 | $52.08 | $2,437,709 |
| May 28, 2020 | 11,626 | $52.40 | $609,202 |
| March 18, 2021 | 214,553 | $68.14 | $14,619,641 |

Thus, in total, before the fraud was exposed, Defendant Essig sold 275,073 shares of Company stock on inside information, for which he received approximately $17.8 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

45.     The 2024 Proxy Statement stated the following about Defendant Essig:

Dr. Essig is Integra's Executive Chairman of the Board of Directors. He has been our Chairman since January 2012 and a director since he joined Integra in 1997. He served as our Chief Executive Officer from 1997 through 2012 and our President from 1997 until 2010. In February 2024, he was appointed as our Executive Chairman of the Board. Prior to joining the Company, he acted as the managing director in mergers and acquisitions for the medical technology practice at Goldman, Sachs & Co. He currently serves as managing director of Prettybrook Partners LLC, a family office dedicated to investing in healthcare companies, which he cofounded in 2012.

**Defendant Graves**

46.     Defendant Graves has served as a director of the Company since 2023. He also

serves as a member of the Compensation Committee.

47.     The 2024 Proxy Statement stated the following about Defendant Graves:

Dr. Graves is currently President and CEO of 3D Systems Corporation, a leading
additive manufacturing solutions provider to industrial and healthcare companies.
From 2012 to May 2020, Dr. Graves served as President and Chief Executive
Officer and a director of MTS Systems Corporation, a global supplier of test,
simulation, and measurement systems. From 2005 until 2012, he served as
President and CEO of C&D Technologies, Inc. Dr. Graves also held leadership
roles with Kemet Corporation as Chief Operating Officer (2001 to 2003) and CEO
(2003 to 2005). Previously he held a number of leadership and technical roles with
GE, Rockwell, and Howmet Corporation.

**Defendant Howell**

48.     Defendant Howell served as a director of the Company from March 2013 until

February 2021.

49.     The Schedule 14A the Company filed on April 8, 2020 (the "2020 Proxy

Statement") stated the following about Defendant Howell:

*LLOYD W. HOWELL, JR.* has been a director of the Company since March 2013.
Mr. Howell is an executive vice president at Booz Allen Hamilton, where he has
held a variety of leadership positions since originally joining the firm in 1988 as a
consultant. He currently serves as the chief financial officer and Treasurer of Booz
Allen Hamilton. During his time with Booz Allen Hamilton he has led the business
in delivering the firm's strategic, technology and analytics capabilities and service
offerings to both the federal and private sectors. Currently, Mr. Howell is a board
member of the Partnership for Public Service, Capital Partners for Education, the
University of Pennsylvania's Engineering School, and a member of the Executive
Leadership Council. Mr. Howell received a B.S. in Electrical Engineering from the
University of Pennsylvania and an M.B.A. from Harvard University. Mr. Howell
is 53 years old.

**Defendant Hill**

50.     Defendant Hill has served as a director of the Company since 2013. She also serves as the Chair of the Nominating and Corporate Governance Committee.

51.     The 2024 Proxy Statement stated the following about Defendant Hill:

Ms. Hill is currently an operating partner of NexPhase Capital, a private equity firm (formerly Moelis Capital Partners), where she focuses on healthcare related investments and has provided strategic operating support for its healthcare portfolio companies since 2011. From March 2006 to September 2010, Ms. Hill served as chief executive officer and a director of ValueOptions, Inc., a managed behavioral health company, and FHC Health Systems, Inc., its parent company. Prior to that, Ms. Hill served as president and a director of Express Scripts, Inc., a pharmacy benefits management company. In previous positions, Ms. Hill was responsible for operations nationally at Cigna HealthCare, and also served as the CEO of health plans owned by Prudential, Aetna and the Johns Hopkins Health System.

**Defendant Lo**

52.     Defendant Lo has served as a Company director since 2022. She also serves as a member of the Compensation Committee.

53.     The 2024 Proxy Statement stated the following about Defendant Lo:

Since September 2022, Ms. Lo has served as partner CTO, APAC Regional Director for Google, responsible for leading the partner technology organization across the Asia Pacific region. From 2019 to September 2022, Ms. Lo was the general manager for Microsoft, leading its data and artificial intelligence business in Asia. Prior to Microsoft, from 2015 to 2019, she built regional technology teams at Amazon Web Services and ran the global business development team for Amazon.com, focusing on telecommunications, consumer hardware devices, and new services. Ms. Lo has more than 13 years of experience in North America, including roles with Microsoft, SAP and Pivotal Software, in addition to Amazon, focusing on collaborative and cloud technologies. She has held leadership roles within product development, commercial, operations, business and corporate strategy.

**Defendant Morel**

54.     Defendant Morel served as a director of the Company from August 2013 until May 2023.

55.     The 2022 Proxy Statement stated the following about Defendant Morel:

*DONALD E. MOREL, JR., PH.D.,* has been a director of the Company since August 2013. Dr. Morel retired as chairman of West Pharmaceutical Services, Inc., a manufacturer of components and systems for the packaging and delivery of injectable drugs as well as delivery system components for the pharmaceutical, healthcare and consumer products industries, in June 2015, after serving the company since March 2003. He also served as West's chief executive officer and also president. Dr. Morel previously served on the board of directors of Kensey Nash Corporation, a medical device product development and manufacturing company. He currently serves on the board of directors of Catalent, Inc, the Stevanato Group S.p.A., American Oncologic Hospital of the Fox Chase Cancer Center, and as chairman of the board of trustees of The Franklin Institute and as a trustee of the University of Virginia Darden School Foundation. Dr. Morel received a B.S. in Engineering from Lafayette College and an M.S. and Ph.D. in Materials Science from Cornell University. Dr. Morel is 64 years old.

**Defendant Murphy**

56.    Defendant Murphy has served as a Company director since 2009. He also serves as a member of the Audit Committee.

57.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Murphy made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| August 16, 2019 | 4,136 | $60.99 | $252,255 |
| August 5, 2022 | 8,000 | $55.78 | $446,240 |

Thus, in total, before the fraud was exposed, Defendant Murphy sold 12,136 shares of Company stock on inside information, for which he received approximately $698,495 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

58.    The 2024 Proxy Statement stated the following about Defendant Murphy:

Mr. Murphy has held several executive level roles with publicly-traded companies including Time Warner Inc., serving as Senior Vice President & Treasurer of Time Warner, Inc., responsible for all U.S. and international corporate finance, project

(real estate and film) finance, cash management, foreign exchange and interest rate risk management, public debt and equity financing, real estate financing, securitization financing, banking relationships and financings, and relationships with rating agencies, as well as corporate wide real estate activities and the property/casualty risk management program. He held the position of senior vice president & treasurer of America Online, Inc. and senior vice president, finance & treasurer of Marriott International, Inc.

**Defendant Schade**

59.     Defendant Schade has served as a Company director since 2006. He also serves as the Chair of the Audit Committee and the Finance Committee.

60.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schade made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| May 10, 2019 | 15,658 | $51.56 | $807,326 |

Thus, in total, before the fraud was exposed, Defendant Schade sold 15,658 shares of Company stock on inside information, for which he received approximately $807,326 in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

61.     The 2024 Proxy Statement stated the following about Defendant Schade:

Mr. Schade currently serves as a Growth Partner at Flagship Pioneering, a venture capital company that invests in biotechnology, life sciences, health and sustainability companies. Previously, from April 2016 to 2022, he served as the chairman and chief executive officer of Aprea Therapeutics, Inc. Prior to joining Aprea Therapeutics, Mr. Schade was the chief executive officer of Novira Therapeutics, Inc., an antiviral drug discovery company until it was acquired by Johnson & Johnson. He also served as executive vice president and chief financial officer of Omthera Pharmaceuticals, Inc., an emerging specialty pharmaceuticals company until it was purchased by AstraZeneca Plc. He previously held executive level positions with other publicly traded companies such as NRG Energy, serving

as executive vice president and chief financial officer and Medarex Inc, as senior vice president administration and chief financial officer. He also held various corporate finance and capital markets positions in New York and London for both Merrill Lynch and JP Morgan Chase & Co.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

62.    By reason of their positions as officers, directors, and/or fiduciaries of Integra and because of their ability to control the business and corporate affairs of Integra, the Individual Defendants owed Integra and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Integra in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Integra and its shareholders so as to benefit all shareholders equally.

63.    Each director and officer of the Company owes to Integra and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

64.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Integra, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

65.    To discharge their duties, the officers and directors of Integra were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

66.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Integra, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Integra's Board at all relevant times.

67.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

68.     To discharge their duties, the officers and directors of Integra were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Integra were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Integra's own Code of Conduct;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Integra conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Integra and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Integra's operations would comply with all applicable laws and Integra's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

69.     Each of the Individual Defendants further owed to Integra and the shareholders the duty of loyalty requiring that each favor Integra's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

70.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Integra and were at all times acting within the course and scope of such agency.

71.     Because of their advisory, executive, managerial, directorial, and controlling positions with Integra, each of the Individual Defendants had access to adverse, non-public information about the Company.

72.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Integra.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

73.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

74.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

75.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Integra was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

76.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

77.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Integra and was at all times acting within the course and scope of such agency.

## INTEGRA'S CODE OF CONDUCT

78.     Integra's Global Code of Conduct (the "Code of Conduct") states that it applies to "all employees, including officers and directors" and that the Company "expect[s] contractors, suppliers, and other third parties working on behalf of Integra to meet the standards of ethics and compliance set out in this Code."

79.     In a section titled "We Comply With Applicable Laws and Regulations," the Code of Conduct states the following:

> As a publicly traded global corporation in the healthcare industry, Integra is subject to numerous laws and regulations. Our reputation, integrity, and trustworthiness depend on remaining in compliance with these laws and regulations. Our rigorous compliance program ensures that we achieve this goal (see Our Global Compliance Program). . . .
>
> In our pursuit of excellence, we comply with all applicable laws, regardless of whether they are discussed in this Code or Integra policy documents.

80.     In a section titled "Our Global Compliance Program," the Code of Conduct states the following, in relevant part:

> We are committed to compliance with national, state, and local laws, rules, and our own policies and procedures. If you have questions or concerns, we encourage you to discuss them with your supervisor or department head. Integra may modify, monitor, and audit this Code of Conduct from time to time. At Integra, we cooperate with audits and investigations, whether internal or external. To that end, we shall not make any false or misleading statements in connection with an audit or investigation. We will not take any other action that could interfere or improperly influence an audit, inspection, or investigation.

81.     In a section titled "We Deliver Safe and High-Quality Products," the Code of Conduct states the following, in relevant part:

> **What We Stand For**
>
> What we do matters. This is especially true when it comes to the safety and quality of our products. We never compromise when it comes to regulatory compliance, and we strive to provide the highest quality products to our customers.
>
> **Why It Matters**

25

Our commitment to quality is central to how we operate. Surgeons rely on our products in their daily work with patients. We must keep quality and safety at the core of what we do. In the end, patients rely on it.

\* \* \*

**WE MAKE PRODUCTS THAT ARE USED TO SAVE LIVES**

Quality is at the core of what we do. Our Quality Department stands on these four principles:

- We provide life-saving products that are safe and effective.

- We are committed to continuous improvement. This applies to our Quality Management System, our products, and our services.

- We meet all regulatory requirements.

- We strive to meet the needs of our customers and partners. Our goal is total customer satisfaction.

**WHAT ARE BEST PRACTICES FOR ENSURING QUALITY?**

We must treat our products as if they will be used to treat our own friends and families. Many laws and regulations govern our products. We must be familiar with these in relation to our roles as part of the Integra team. Here are some key areas of compliance:

- Good manufacturing practices (GMPs)

- Quality system regulations (QSRs)

- Good laboratory practices (GLPs)

- Good tissue practices (GTPs)

- Guidelines for clinical studies

82.    In a section titled "We Avoid Conflicts of Interest," the Code of Conduct states the

following, in relevant part:

**Why It Matters**

As a team, we put the company first. This means making business decisions that are in the best interests of the company. Conflicts of interest, which put self-interest

26

ahead of company interests, should never be tolerated. Our reputation for integrity depends on it.

83.     In a section titled "We Do Not Engage in Insider Trading," the Code of Conduct

states the following, in relevant part:

**What We Stand For**

We never use or share material, nonpublic information for the purposes of insider trading. Our integrity demands that we never seek personal gain this way.

**Why It Matters**

Insider trading is a serious violation that comes with serious penalties. These can include loss of employment, fines, and even jail time. Insider trading is unfair and distorts markets. It can also do serious harm to our reputation. We cannot lose the trust of our customers and their patients.

84.     In a section titled "We Keep Accurate Accounts and Records," the Code of Conduct

states the following, in relevant part:

**What We Stand For**

We need confidence to make good decisions and drive action. Keeping accurate accounts and records gives us that confidence. It is also the right thing to do.

**Why It Matters**

Integra is a publicly traded company. We therefore have an obligation to our shareholders to accurately present our financial information as regulated by the Securities and Exchange Commission (SEC). We also communicate with the public through press releases and presentations. Accurate records in such communications help us maintain trust with our partners and customers. They also support our decisiveness in executing business transactions.

85.     In violation of the Code of Conduct, the Individual Defendants (as key officers and

as members of the Company's Board) conducted little, if any, oversight of the Company's

engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public, and to facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate

assets, and unjust enrichment.  Also in violation of the Code of Conduct, the Individual Defendants

failed to comply with laws and regulations, conduct business in an honest and ethical manner, and

properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

86.    The Company also maintains an Audit Committee Charter. The Charter explains

that the purpose of the Audit Committee as:

> (i) the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company; (ii) the independence, quality control and work of the Company's external independent auditor and the appointment and performance evaluation of the internal auditor (as defined below); and (iii) the Company's compliance program, including but not limited to the Company's compliance with the Foreign Corrupt Practices Act, False Claims Act, Physician Self-Referral Law (Stark) and Anti-Kickback Statute, and similar foreign requirements.

87.    Under the heading titled "Duties and Responsibilities," in the subsection titled

"Annual Financial Statements and Annual Audit," the Audit Committee Charter states the

following, in relevant part:

> 4.    Meetings with Management and the Independent Auditors. The Committee shall meet with management, the independent auditors and, if appropriate, the internal auditor, in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit.
>
> (i)    The Committee shall review and discuss with management and the independent auditors any material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities of which the Committee is made aware that do not appear on the financial statements of the Company and that may have a material current or future effect on the Company's financial condition, results of operations, liquidity, capital expenditures, capital resources or significant components of revenues or expenses.
>
> (ii) The Committee shall advise management, the internal auditor and the independent auditors that they are expected to provide to the Committee a timely analysis of significant issues and practices relating to accounting principles and policies, financial reporting and internal control over financial reporting.

5.  Separate Meetings with the Independent Auditors.

    (i)  The Committee shall discuss with the independent auditors any significant issues arising from the most recent PCAOB inspection of the independent auditors to the extent relevant to the Company, including the independent auditors' response to any identified accounting deficiencies.

    (ii)  The Committee shall consider any reports or communications (and management's and/or the internal auditor's responses thereto) submitted to the Committee by the independent auditors required by or referred to in applicable PCAOB or other applicable standards, including, as applicable, reports and communications related to any illegal acts committed by management, and any other matters arising out of the audit that are significant to the oversight of the Company's financial reporting process, including complaints or concerns regarding accounting or auditing matters, that came to their attention during the course of the audit.

    (iii) The Committee shall obtain from the independent auditors in connection with any audit a timely report relating to the Company's annual audited financial statements describing: (A) all accounting policies and practices used that the independent auditors identify as critical; (B) all alternative treatments within GAAP for policies and practices related to material items that have been discussed among management and the independent auditors, including the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; (C) all other material written communications between the independent auditors and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent auditors' engagement letter, independent auditors' independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any; and (D) assurances that the audit was conducted in a manner consistent with Section 10A of the Exchange Act, which sets forth certain procedures to be followed in any audit of financial statements required under the Exchange Act.

6.  Recommendation to Include Financial Statements in Annual Report. The Committee shall, based on the review and discussions in paragraphs 4 and 5 above, and based on the disclosures received from the independent auditors regarding its independence and discussions with the auditor regarding such independence pursuant to subparagraph 3(ii) above, determine whether to recommend to the Board that the audited financial

statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

88.     Under the same heading, in a subsection titled "Internal Audit," the Audit

Committee Charter states that the Audit Committee is responsible for the following:

> 7.  Appointment. The Committee shall review and approve the appointment and replacement of the internal auditor director and oversee the evaluation of his or her performance and determinations of his or her compensation.
>
> 8.  Communications with the Internal Auditor. The Committee shall receive communications from the internal audit director on internal audit's performance relative to its annual audit plan and other matters.
>
> 9.  Internal Audit Charter. The Committee shall at least annually review and reassess the Internal Audit Charter and submit any recommended changes to the Board for its consideration.
>
> 10. Internal Audit Plan. The Committee shall review and approve the annual risk based internal audit plan and significant changes to that plan.
>
> 11. Internal Audit Budget. The Committee shall review and approve the internal audit budget and resources necessary to achieve annual audit plan objectives.
>
> 12. Inquiries. The Committee shall make appropriate inquiries of management and the internal audit director to determine whether there are inappropriate scopes or resource limitations.
>
> 13. Quality Assessments. The Committee shall review the results of the internal and external quality assessments.

89.     Under the same heading, in a subsection titled "Other Duties and Responsibilities,"

the Audit Committee Charter states that the Audit Committee is responsible for the following:

> 14. The Committee shall review all related party transactions on an ongoing basis, and all such transactions must be approved by the Committee in accordance with the policies of the Company in effect from time to time.
>
> 15. Receive a report, at least annually, from management regarding, and review compliance processes relating to, the Company's Code of Conduct, including the Company's compliance with the Foreign Corrupt Practices Act, False Claims Act, Physician Self-Referral Law (Stark) and Anti-Kickback Statute, and similar foreign requirements, and to review and

oversee the Company's policies, procedures and programs designed to promote and monitor compliance.

16. Meet in executive session with the Chief Compliance Officer the Chief Legal Office or others members of senior management, at his, her, or the Committee's request, to discuss any aspect of the performance of the Company's compliance program, including the results of significant compliance audits and investigations conducted within the compliance program and corrective or preventive actions taken as a result of significant compliance audits and investigations, the processes and procedures for management's monitoring of compliance with laws, and major legislative and regulatory developments that may have a significant impact on the Company.

17. The Committee shall discuss with management and/or the independent auditors, as appropriate, (i) legal matters that may have a material impact on the financial statements, (ii) any fraud involving management or other employees who have a significant role in the Company's internal controls, (iii) compliance policies, and (iv) any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies, internal audit function or compliance policies.

18. The Committee shall discuss with the Company's Chief Legal Officer, Chief Compliance Officer or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to (i) have a material impact on the Company's financial statements or (ii) result in a material violation of the Company's compliance policies, including the results and effectiveness of management's investigation and follow-up (including disciplinary action) of any instances of material non-compliance with the Company's compliance policies.

19. Advise the Board with respect to the Company's compliance program, including but not limited to the Company's compliance with the Foreign Corrupt Practices Act, False Claims Act, Physician Self-Referral Law (Stark) and Anti-Kickback Statute, and similar foreign requirements.

20. The Committee shall request assurances from management, and the Company's internal auditors that the Company's foreign subsidiaries and foreign affiliated entities, if any, are in conformity with applicable legal requirements, including disclosure of affiliated party transactions.

21. The Committee shall review and discuss any reports concerning material violations submitted to it by any attorney employed by or performing legal services for the Company pursuant to the SEC attorney professional responsibility rules (17 C.F.R. Part 205), or otherwise.

22. The Committee shall review and approve procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters. The Committee shall also review and approve procedures for the confidential and anonymous submission by employees regarding questionable accounting or auditing matters.

23. The Committee shall prepare any report or other disclosures, including any recommendation of the Committee, required by the rules of the SEC to be included in the Company's annual proxy statement.

24. The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, the performance of the Company's internal audit function, the effectiveness of the Company's compliance policies or any other matter the Committee determines is necessary or advisable to report to the Board.

25. The Committee shall oversee the quality and integrity of the Company's data relating to climate change and similar environmental, social and governance matters included in the Company's filings with the SEC, including such compensation metrics included in the Company's annual proxy statement and any greenhouse gas disclosures required by any applicable law, rule or regulation.

26. The Committee shall at least annually review and reassess the Treasury Department's policies and submit any recommended changes to the Board for its consideration.

27. The Committee shall at least annually prepare and review with the Board an evaluation of the performance of the Committee and its members, including a review of the Committee's compliance with this Charter.

28. The Committee shall at least annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

29. The Committee shall perform such other activities and make such other recommendations to the full Board on such matters, within the scope of its functions and consistent with this Charter, as may come to its attention, including any issues regarding the integrity of financial statements, the Company's compliance program, performance of the independent auditors, and performance of internal audit functions, and as the Committee may deem necessary or appropriate.

90.     In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

91.     Integra was founded in 1989 as an international medical technology company. Among the Company's various products is its biologic mesh, an engineered collagen technology platform that is used to repair and regenerate tissue.

92.     The Company markets and sells its products in over 130 countries through its direct sales force, as well as indirectly through distributors and wholesalers. The Company reports its business in two different segments: Codman Specialty Surgical and Tissue Technologies. The Tissue Technologies segment is based on complex wound surgery, surgical reconstruction, and peripheral nerve repair. Additionally, the Tissue Technologies segment consists of five unique regenerative technology areas.

93.     The Company acquired TEI Biosciences, Inc. and TEI Medical Inc. ("TEI") in July 2015 as a method of expanding the Company's surgery and reconstructive wound care product

offering. At this time, TEI was breaking out as a producer of biologic mesh products, including SurgiMend and PriMatrix.

94.     As a result of the acquisition of TEI, the Company began to produce SurgiMend and PriMatrix, as well as assuming the lease of TEI's exclusive manufacturing facility in Boston (the "Boston Facility"). The Company also began to focus more on its biologic mesh portfolio, assuring investors that its new focus on biologic mesh was integral to the Company's growth.

### FDA Regulations

95.     As a manufacturer of medical technology, the Company is required to comply with FDA regulations that govern the manufacture of medical devices, including cGMPs.

96.     Manufacturers of medical devices are required to comply with cGMP regulations, which are minimum requirements set by the FDA for the methods, facilities, and controls used in the design, manufacturing, packaging, labeling, storage, installation, and servicing of medical devices. *See* 21 C.F.R. § 820.1(a)(1).

97.     Furthermore, medical devices are subject to the "adulteration provisions" of the Federal Food, Drug, and Cosmetic Act ("FD&C Act"). *See* 21 U.S.C. § 351. Under these regulations, a device is "deemed to be adulterated" if a device and the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity with applicable requirements under [cGMPs]." 21 U.S.C. § 351(h).

98.     As such, a medical device that is not manufactured in accordance with cGMPs is considered to be "adulterated" by the FDA.

99.     cGMP standards require manufacturers, *inter alia*, to establish strong quality control systems, maintain sufficient levels of personnel, establish and maintain procedures to control the design of devices, approve testing procedures, control environmental conditions,

prevent contamination, and identify and correct any deviations from these standards. 21 C.F.R. Pt. 820, *et seq*.

100.    Additionally, manufacturers must develop a "Correct and Preventative Action" ("CAPA") system, which is a system that is designed for implementing corrective and preventative actions after defects are identified. 21 C.F.R. § 820.100.

101.    Data integrity in accordance with cGMPs has received special attention from the FDA in order to ensure that all testing and quality control data is complete, consistent, accurate, and free from manipulation. The FDA has stated that "[d]ata integrity is critical throughout the CGMP data life cycle, including in the creation, modification, processing, maintenance, archival, retrieval, transmission, and disposition of data after the record's retention period ends. System design and controls should enable easy detection of errors, omissions, and aberrant results throughout the data's life cycle."[2]

102.    The FDA also conducts periodic inspections of medical device manufacturing facilities to ensure compliance.[3] If an investigator observes any objectionable condition that may violate the law, including violations of cGMPs, the FDA issues a Form 483 to the manufacturer.[4] The Form 483 is then discussed with the management of the manufacturer at the end of an inspection, and each observation is read and discussed to ensure a full understanding of what the

---

[2] U.S. Food and Drug Administration, *Data Integrity and Compliance with Drug CGMP*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.fda.gov/media/119267/download (last visited Feb. 19, 2025).
[3] U.S. Food and Drug Administration, *Inspection Classification Database*, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-classification-database (last visited Feb. 19, 2025).
[4] U.S. Food and Drug Administration, *FDA Form 483 Frequently Asked Questions*, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last visited Nov. 25, 2024).

observations are and what they mean. The FDA also issues an Establishment Inspection Report ("EIR") which includes additional details on the observation. Manufacturers are expected to respond to Form 483s in writing within fifteen days of its issuance.[5]

103.    Where the FDA believes that a manufacturer has failed take appropriate corrective measures in response to a Form 483, the FDA will issue a warning letter to the manufacturer. These letters identify areas of concern observed by the FDA, as poor manufacturing practices, problems with claims for what a product can do, or incorrect directions for use, and provide an opportunity for the manufacturer to address the FDA's concerns within a certain timeframe.[6]

104.    Manufacturers that violate cGMP requirements face severe sanctions from the FDA. For instance, among other things, the FDA has the authority to impose civil money penalties on manufacturers or remove a product from the market if it finds that the manufacturer is in violation of cGMP regulations. *See* 21 U.S.C. § 333; 21 C.F.R. §800.55(i).

### Compliance Issues by the Company and its Subsidiaries

105.    The FDA conducted an inspection of the Boston Facility in October and November of 2018, in which several cGMP violations were detected, including violations of the requirements for preventing toxic bacterial contamination of the Company's surgical tissue reconstruction products. As a result, on November 2, 20218, the FDA issued the Company and TEI a Form 483 (the "2018 Form 483") and held a "close-out" meeting with management to discuss these findings. The FDA issued an EIR pursuant to the same inspection on November 28, 2018 (the "2018 EIR"). Both the 2018 Form 483 and 2018 EIR cited the Company and TEI for multiple deficiencies in

---

[5] *Inspection Classification Database*, *supra* note 3.
[6] U.S. Food and Drug Administration, *About Warning and Close-Out Letters*, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/about-warning-and-close-out-letters (last visited Feb. 19, 2025).

contamination controls, environmental controls, process validation controls, and CAPA controls related to the Company's manufacturing of EBM products. The 2018 EIR stated that the FDA was directed to send any correspondence pursuant to the inspection directly to Defendant Arduini.

106.    The Company and TEI responded to the 2018 Form 483 and 2018 EIR on November 27, 2018, December 27, 2018, January 31, 2019, and February 28, 2019.

107.    On March 6, 2019, the FDA issued TEI the 2019 Warning Letter, which was addressed to Defendant Arduini. The 2019 Warning Letter was also published on the FDA's website and repeated the deficiencies identified by the 2018 Form 483 and the 2018 EIR.

108.    The 2019 Warning Letter stated that he Company an TEI failed to take sufficient action to correct the cGMP violations identified by the FDA, stating, in relevant part:

> We reviewed your firm's response to FDA 483 observations 1-3 (Warning Letter cite 1 and 2 above) and conclude they are not adequate to address the above violations. We acknowledge that after the inspection, your **(b)(4)** of all products, so you can test individual lots for endotoxin. We also understand that you opened additional CAPA's to address FDA's above findings and are in the process of implementing a number of corrective actions to address these items. ***However, the above deficiencies observed during our inspection are significant and demonstrate a systemic failure of your firm's quality systems.***

109.    After the start of the Relevant Period, the FDA conducted a nine-day inspection of the Boston Facility in October and November of 2021. Upon the conclusion of the inspection, the FDA issued a Form 483 to TEI and the Company (the "2021 Form 483"). The 2021 Form 483 cited the Company for cGMP deficiencies in its environmental controls and process validation controls that the Company failed to remediate after the 2018 Form 483.

110.    The Company again received notice that the Boston Facility was in violation of several cGMP regulations in October 2022, when an internal whistleblower reported the violations to the Company's compliance department. The whistleblower stated that thirty-seven lots of

unfinished products awaiting distribution in the Boston Facility were exposed to bacterial endotoxin contamination.

111.    In response to the whistleblower's complaint, on March 1, 2023, the FDA initiated a ten-week long inspection of the Boston Facility, issuing another Form 483 to the Company and TEI on May 17, 2023 (the "2023 Form 483"). The 2023 Form 483 detailed the systemic violations of cGMP at the Boston Facility, including deficiencies in the Company's contamination and process validation controls, product non-conformance controls, and CAPA controls.

112.    Twelve days into this inspection, on March 13, 2023, the Company placed the production and distribution of all products at the Boston Facility on hold.

113.    Upon consultation with the FDA, on May 23, 2023, the Company filed a Form 8-K with the SEC announcing that it had initiated a voluntary recall of products manufactured at the Boston Facility between March 1, 2018 and May 22, 2023 (the "Recall"). Among these products were SurgiMend, PriMatrix, and other biologic mesh products. The 8-K also announced that the Company was extending the temporary halt of manufacturing at the Boston Facility in order to implement additional detection and quality controls. In the 8-K, the Company stated that it "identified through an internal investigation process in its Boston facility deviations with endotoxin testing that may have resulted in the release of products with higher levels of endotoxins than permitted by the product specifications," and that it "decided to initiate the voluntary recall and extend the temporary halt of manufacturing at its Boston facility to implement additional detection and quality controls."

114.    On June 8, 2023, the Company responded to the 2023 Form 483. In its response, the Company admitted there were "areas requiring additional attention and improvement" and acknowledging the need to "adjust [Integra's] previously established remediation plans." This

letter was signed by Susan Krause, Integra's Chief Quality Officer, and copied Defendant De Witte.

115.    On July 19, 2023, TEI received another warning letter, dated July 17, 2023, pertaining to quality system issues at the Boston Facility (the "2023 Warning Letter"). The 2023 Warning Letter was also published on the FDA's website. The 2023 Warning Letter was addressed to Defendant De Witte and identified the Boston Facility's continual, never-remediated cGMP violations. The 2023 Warning Letter stated that Integra still had not "identified all the necessary corrective actions to demonstrate that your quality system will ensure controls are in place to prevent the release of non-conforming product[s]" before noting that many of the deficiencies identified were repeat ""deficienc[ies] from [the FDA's] 2019 Warning Letter to this facility." As a result, the FDA considered the Boston Facility's products to be "adulterated"

116.    As a result, the 2023 Warning Letter stated that, despite the Recall, the Company's remediation efforts were "not adequate" and self-regulation by the Company was no longer an option. The 2023 Warning Letter stated that the Company must receive a "certification by an outside expert consultant that he/she has conducted an audit of your establishment's manufacturing and quality assurance systems relative to [cGMP] requirements," submit the consultant's report to the FDA, and also submit  a "certification by your establishment's Chief Executive Officer [] that he or she has received the consultant's report and that your establishment has initiated or completed all corrections called for in the report" to the FDA.

**<u>False and Misleading Statements</u>**

***March 11, 2019 Form 8-K***

117.    On March 11, 2019, the Company filed the March 2019 Warning Letter 8-K with the SEC. The March 2019 Warning Letter 8-K informed investors that, despite the issues identified

by the 2019 Warning Letter, the Company was taking steps to remediate those issues. The March

2019 Warning Letter 8-K stated, in relevant part:

> The warning letter relates to quality systems issues at our manufacturing facility located in Boston, Massachusetts. The letter resulted from an inspection held at that facility in October and November 2018, and did not identify any new observations that were not already provided in the Form 483 that followed the inspection. ***We take the matters identified in the letter seriously and are in the process of preparing a written response to the letter.*** The Company has provided detailed responses to the FDA as to its corrective actions on a monthly basis and, since the conclusion of the inspection, ***has undertaken significant efforts to remediate the observations and continues to do so***.

> ***The warning letter does not restrict the Company's ability to manufacture or ship products or require the recall of any products***. . . .

> ***The Company does not expect to incur material incremental expense for remediation activities***.

> ***April 16, 2019 Proxy Statement***

118.    On April 16, 2019, the Company filed its Schedule 14A with the SEC (the "2019

Proxy Statement"). In discussing the "Board's Role in Risk Oversight," the 2019 Proxy Statement

informed investors that the Board had effective risk oversight procedures in place, stating, in

relevant part:

> The Board of Directors has overall responsibility for the oversight of risk management at the Company. . . .

> Each year management presents a detailed report to the Board on the Company's processes in place for assessing and addressing risks, providing periodic reports on compliance regimens and reporting material information to the Board. This report assists the Board in its evaluation of the Company's risk management practices.

> Our President and Chief Executive Officer, who functions as our chief risk officer, has responsibility for ensuring that management provides periodic updates to the Board or Board Committees regarding risks in many areas, among them accounting, treasury, information systems, legal, governance, legislative (including reimbursement), general compliance (including sales and marketing compliance), quality, ***regulatory***, climate-related risks and opportunities, corporate development, operations and sales and marketing. Both formal reports and less formal communications derive from a continual flow of communication throughout the

Company regarding risk and compliance. ***We believe that our Board and senior management team promote a culture that actively identifies and manages risk, including effective communication throughout the entire organization and to the Board and Committees.***

***April 29, 2019 Form 10-Q***

119.   On April 29, 2019, the Company filed its quarterly report on Form 10-Q (the "Q1 2019 10-Q" for the first quarter of the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"). The Q1 2019 10-Q was signed by Defendants Arduini, Coleman, and Mosebrook and attached certifications made by Defendants Arduini and Coleman pursuant to Exchange Act Sections 13a-15(e) and 15d-15(e) and Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the Q1 2019 10-Q.

120.   The Q1 2019 10-Q discussed the remediation efforts the Company was supposedly taking at the Boston Facility, stating that they were not expected to have a significant impact on the Company, stating:

> The Company has provided detailed responses to the FDA as to its corrective actions on a monthly basis and, since the conclusion of the inspection, ***has undertaken significant efforts to remediate the observations and continues to do so***. The warning letter does not restrict the Company's ability to manufacture or ship products or require the recall of any products. . . .
>
> ***The Company does not expect to incur material incremental expense for remediation activities.***

***July 25, 2019 Form 10-Q***

121.   On July 25, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of the 2019 Fiscal Year (the "Q2 2019 10-Q"). The Q2 2019 10-Q was signed by Defendants Arduini, Anderson, and Mosebrook and attached SOX certifications signed by Defendants Arduini and Coleman attesting to the accuracy of the Q2 2019 10-Q.

122. The Q2 2019 10-Q contained the same statement regarding the remediation efforts at the Boston Facility and the respective impact on the Company as the Q1 2019 10-Q. *Supra* ¶ 120.

**November 25, 2019 Form 10-Q**

123. On November 25, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of the 2019 Fiscal Year (the "Q3 2019 10-Q"). The Q3 2019 10-Q was signed by Defendants Arduini, Anderson, and Mosebrook and attached SOX certifications signed by Defendants Arduini and Anderson attesting to the accuracy of the Q3 2019 10-Q.

124. The Q3 2019 10-Q contained the same statement regarding the remediation efforts at the Boston Facility and the respective impact on the Company as the Q1 2019 10-Q. *Supra* ¶ 120.

**February 19, 2020 Earnings Call**

125. On February 19, 2020, the Company hosted an earnings call with investors and analysts to discuss the financial results for the fourth quarter and year-end of the 2019 Fiscal Year (the "FY 2019 Earnings Call"). During the FY 2019 Earnings Call, Defendant Coleman discussed the remediation efforts at the Company's Boston Facility, assuring investors that the efforts were on schedule and would not have a significant impact on the Company. For example, in response to a question regarding the Company's sales from regenerative products, Defendant Coleman replied, "Boston, we've been supply constrained for a different reason. You probably remember, we went through an FDA audit. ***We've been doing quality remediation efforts throughout 2019. There are no patient safety issues here***."

126. In response to a separate question regarding the remediation efforts, Defendant Coleman stated that ""[w]e're on a better path forward in terms of supply out of Boston. And ***we***

***expect to have the remediation efforts complete in the short-term*** and then get the warning letter lifted in 2020."

127.    Defendant Coleman also made sure to state to investors that the FDA inspection and findings would not have an effect on the Company's ability to manufacture EBM products at the Boston Facility, stating:

> ***We are continuing to ship out of [the Boston Facility]***, but there were changes we had to make to the actual physical facility and those changes required us to actually shut down the plant, which is planned at the end of the third quarter and into the fourth quarter. . . .
>
> As we are going through plant shutdown, ***we extended that shut down for several weeks to add an additional production line, which is going to get us 50% more capacity as we enter 2020***. . . .

> ***February 21, 2020 Form 10-K***

128.    On February 21, 2020, the Company filed its annual report on Form 10-K for the 2019 Fiscal Year (the "2019 10-K"). The 2019 10-K was signed by Defendants Arduini, Anderson, Mosebrook, Essig, Ballintyn, Bradley, Hill, Howell, Morel, Murphy, and Schade and attached SOX certifications signed by Defendants Arduini and Anderson attesting to the accuracy of the 2019 10-K.

129.    In discussing the remediation efforts at the Boston Facility and how those efforts would not have a significant impact on the Company, the 2019 10-K stated:

> The Company has provided detailed responses to the FDA as to its corrective actions on a monthly basis and, since the conclusion of the inspection, ***has undertaken significant efforts to remediate the observations and continues to do so. The warning letter does not restrict the Company's ability to manufacture or ship products or require the recall of any products***. Nor does it restrict our ability to seek FDA 510(k) clearance of products. . . .

> ***The company does not expect to incur material incremental expense for remediation activities.***

> ***April 8, 2020 Proxy Statement***

130.    On April 8, 2020, the Company filed the 2020 Proxy Statement with the SEC. In discussing the "Board's Role in Risk Oversight," the 2020 Proxy Statement echoed the 2019 Proxy Statement by informing investors that the Board had effective risk oversight procedures in place, stating, in relevant part:

> In general, the Board of Directors has overall responsibility for the oversight of risk management at the Company. . . .
>
> Each year management presents a detailed report to the Board on the Company's processes in place for assessing and addressing risks, providing periodic reports on compliance regimens and reporting material information to the Board. This report assists the Board in its evaluation of the Company's risk management practices.
>
> Our President and Chief Executive Officer, who functions as our chief risk officer, has responsibility for ensuring that management provides periodic updates to the Board or Board Committees regarding risks in many areas, among them accounting, treasury, information systems, legal, governance, legislative (including reimbursement), general compliance (including sales and marketing compliance), quality, regulatory, environment, social and governance (ESG) risks and opportunities, corporate development, operations and sales and marketing. Both formal reports and less formal communications derive from a continual flow of communication throughout the Company regarding risk and compliance. ***We believe that our Board and senior management team promote a culture that actively identifies and manages risk, including effective communication throughout the entire organization and to the Board and Board Committees.***

***May 7, 2020 Earnings Call***

131.    On May 7, 2020, the Company hosted an earnings call with investors and analysts (the "Q1 2020 Earnings Call") to discuss the financial results from the first quarter of the fiscal year ended December 31, 2020 (the "2020 Fiscal Year").

132.    During the Q1 2020 Earnings Call, Defendant Anderson informed investors that the Company still had a continued demand for its biologic mesh products, stating, *inter alia*, "[s]ales of [] SurgiMend increased double digits in the quarter, driven by the increase in supply coming from the capital investments we initiated last year at [the Boston Facility]."

133.    Defendant Coleman discussed the Company's growth from the Boston Facility and biologic mesh products, stating:

> So we have about 17 manufacturing sites, not all as equal each of the sites, to Carrie's point. And certain plants like Boston and Memphis, which are regenerative plants we make in and out of tissue in Memphis. SurgiMend used for hernia as well as in plastic reconstructive along with PriMatrix for wound care in Boston. ***Those plants are pretty much running normal capacity. And during this period of lower demand, we're actually building safety stock***. These are going to be products that we should see very good growth when things come back to normal, when we get the regular procedures. ***So double-digit growth we were posting last year. We continue to expect that. Once we get back to normal, we're going to have plenty of safety stock to support that ramp when it comes back.*** So that's the good news.

***May 7, 2020 Form 10-Q***

134.    On May 7, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of the 2020 Fiscal Year (the "Q1 2020 10-Q"). The Q1 2020 10-Q was signed by Defendants Arduini, Anderson, and Mosebrook and attached SOX certifications signed by Defendants Arduini and Anderson attesting to the accuracy of the Q1 2020 10-Q.

135.    The Q1 2020 10-Q contained the same statement regarding the remediation efforts at the Boston Facility and the respective impact on the Company as the Q1 2019 10-Q. *Supra* ¶ 120.

***May 20, 2020 UBS Global Virtual Healthcare Conference***

136.    On May 20, 2020, Defendant Anderson took part in a presentation on behalf of the Company at the UBS Global Virtual Healthcare Conference. In response to a question from an analyst regarding the "the factors driving the wound business" and the Company's manufacturing, Defendant Anderson stated that the production of the Boston Facility remained at regular levels, stating that "in terms of the Boston facility, that's the one that really is untouched from an overall manufacturing plan perspective. We're continuing to run that factory as before in order for us to use this time to build up safety stock in SurgiMend and PriMatrix."

### August 10, 2020 Form 10-Q

137.    On August 10, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of the 2020 Fiscal Year (the "Q2 2020 10-Q"). The Q2 2020 10-Q was signed by Defendants Arduini, Anderson, and Mosebrook and attached SOX certifications signed by Defendants Arduini and Anderson attesting to the accuracy of the Q2 2020 10-Q.

138.    The Q2 2020 10-Q contained the same statement regarding the remediation efforts at the Boston Facility and the respective impact on the Company as the Q1 2019 10-Q. *Supra* ¶ 120.

### October 28, 2020 Earnings Call

139.    On October 28, 2020, the Company hosted an earnings call with investors and analysts to discuss the Company's financial results for the third quarter of the 2020 Fiscal Year (the "Q3 2020 Earnings Call"). During the Q3 2020 Earnings Call, Defendant Coleman highlighted how the EBM products manufactured at the Boston Facility were critical to the Company's future growth, stating:

> I think overall, ***we're in great shape when you look at our regenerative supply***. . . .
>
> And when I think about our Waston plan, which makes SurgiMend and PriMatrix, I think about Memphis and the amniotics business, we can actually now build more product, and ***we've actually built more safety stock for those regenerative products. So we're in very good shape.*** And as Carrie mentioned, as sales start to ramp up with our regenerative products. These are very high-margin products for us, 80% plus. So we're well positioned not just to capitalize on the top line, but also to show that favorable mix and actually drive higher gross margins going forward.

### October 29, 2020 Form 10-Q

140.    On October 29, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of the 2020 Fiscal Year (the "Q3 2020 10-Q"). The Q3 2020 10-Q

was signed by Defendants Arduini, Anderson, and Mosebrook and attached SOX certifications signed by Defendants Arduini and Anderson attesting to the accuracy of the Q3 2020 10-Q.

141.    The Q3 2020 10-Q contained the same statement regarding the remediation efforts at the Boston Facility and the respective impact on the Company as the Q1 2019 10-Q. *Supra* ¶ 120.

### *February 23, 2021 Form 10-K*

142.    On February 23, 2021, the Company filed its annual report on Form 10-K with the SEC for the 2020 Fiscal Year (the "2020 10-K"). The 2020 10-K was signed by Defendants Arduini, Anderson, Mosebrook, Essig, Ballintyn, Bradley, Hill, Howell, Morel, Murphy, and Schade and attached SOX certifications signed by Defendants Arduini and Anderson attesting to the accuracy of the 2020 10-K.

143.    In discussing the remediation efforts at the Boston Facility and the impact they would have on the Company, the 2020 10-K stated:

> The Company submitted its initial response to the FDA Warning Letter on March 28, 2019 and provides regular progress reports to the FDA as to its corrective actions and, since the conclusion of the inspection, ***has undertaken significant efforts to remediate the observations and continues to do so. The warning letter does not restrict the Company's ability to manufacture or ship products or require the recall of any products***. . . .
>
> ***The Company does not expect to incur material incremental expense for remediation activities.***

### *April 9, 2021 Proxy Statement*

144.    On April 9, 2021, the Company filed the 2021 Proxy Statement with the SEC. In discussing the "Board's Role in Risk Oversight," the 2021 Proxy Statement echoed the 2019 and 2020 Proxy Statements by informing investors that the Board had effective risk oversight procedures in place, stating, in relevant part:

The Board of Directors has overall responsibility for the oversight of risk management at the Company and has delegated responsibility for the oversight of certain areas of risk management to the Committees of the Board, as described below. . . .

The Company has also implemented an Enterprise Risk Management ("ERM") program to further enhance its oversight of risks inherent to the business. This ERM program allows the Board and management to gain a greater understanding and awareness of risks facing the business and to mitigate those risks.

In addition to periodic updates management provides to the Board on the ERM program, management presents an annual report to the Board detailing the Company's processes for (1) assessing and addressing risks, (2) **compliance reporting**, and (3) the reporting of other material information.

Our President and Chief Executive Officer, who functions as our chief risk officer, has responsibility for ensuring management provides periodic updates to the Board or Board committees regarding risks in many areas, among them accounting, treasury, information systems, legal, governance, legislative (including reimbursement), general compliance (including sales and marketing compliance), quality, **regulatory**, sustainability, environment, social and governance ("ESG") risks and opportunities, corporate development, operations and sales and marketing. Both formal reports and less formal communications between the Board and our President and Chief Executive Officer derive from a continual flow of communication throughout the Company regarding risk and compliance. **We believe our Board and senior management team promote a culture that actively identifies and manages risk.**

The ERM program, along with our annual processes for creating and reviewing with the Board our strategic plan, budget and internal audit plans, as well as regular processes and communications throughout the Company, including between management and the Board and Board committees, **combine to ensure the Company is continually addressing its business risks in a disciplined fashion**.

145. The 2021 Proxy Statement also discussed the Code of Conduct and its "comprehensive compliance program," stating, in relevant part, "Integra is committed to its Code of Conduct and to holding the Company accountable as a leader in the medical technology industry. The Company operates a comprehensive compliance program, which is supported by a training program led by Integra's Chief Compliance Officer."

**April 29, 2021 Form 10-Q**

146.    On April 29, 2021, the Company filed its quarterly report on Form 10-Q (the "Q1 2021 10-Q") with the SEC for the first quarter of the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"). The Q1 2021 10-Q was signed by Defendants Arduini, Anderson, and Mosebrook and attached SOX certifications signed by Defendants Arduini and Anderson attesting to the accuracy of the Q1 2021 10-Q.

147.    The Q1 2021 10-Q contained the same statement regarding the remediation efforts at the Boston Facility and the respective impact on the Company as the Q1 2019 10-Q. *Supra* ¶ 120.

### *May 20, 2021 Investors Day*

148.    On May 20, 2021, the Company hosted its 2021 Virtual Investors Day. During the Investors Day, Defendant Coleman discussed the remediation efforts of the Boston Facility, which were "now complete," while also downplaying the effects of the FDA investigation, stating that "the key takeaway here is we've strengthened our quality operating mechanisms and reduced quality risk with enhanced rigor and this has led to better FDA inspection result."

149.    Defendant Coleman also made sure to highlight the expected growth of the Boston Facility and two other plants, which were expected to deliver "the greatest growth [] over the next 5 years."

### *July 29, 2021 Form 10-Q*

150.    On July 29, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of the 2021 Fiscal Year (the "Q2 2021 10-Q"). The Q2 2021 10-Q was signed by Defendants Arduini, Anderson, and Mosebrook and attached SOX certifications signed by Defendants Arduini and Anderson attesting to the accuracy of the Q2 2021 10-Q.

151.    The Q2 2021 10-Q contained the same statement regarding the remediation efforts at the Boston Facility and the respective impact on the Company as the Q1 2019 10-Q. *Supra* ¶ 120.

### November 2, 2021 Form 10-Q

152.    On November 2, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of the 2021 Fiscal Year (the "Q3 2021 10-Q"). The Q3 2021 10-Q was signed by Defendants Arduini, Anderson, and Mosebrook and attached SOX certifications signed by Defendants Arduini and Anderson attesting to the accuracy of the Q3 2021 10-Q.

153.    The Q3 2021 10-Q contained the same statement regarding the remediation efforts at the Boston Facility and the respective impact on the Company as the Q1 2019 10-Q. *Supra* ¶ 120.

### February 24, 2022 Form 10-K

154.    On February 24, 2021, the Company filed its annual report on Form 10-K with the SEC for the 2021 Fiscal Year (the "2021 10-K"). The 2021 10-K was signed by Defendants De Witte, Anderson, Mosebrook, Essig, Ballintyn, Bradley, Clay, Hill, Morel, Murphy, and Schade and attached SOX certifications signed by Defendants De Witte and Anderson attesting to the accuracy of the 2022 10-K.

155.    The 2021 10-K announced that the FDA had performed another inspection of the Boston Facility in October and November 2021 and issued the 2021 Form 483 on November 12, 2021. The 2021 10-K downplayed the effects of the 2021 Form 483, stating that "[t]he Warning Letter and the 2021 Form 483 do not restrict the Company's ability to manufacture or ship products or require the recall of any products, nor do they restrict our ability to seek FDA 510(k) clearance of products."

156.    Additionally, regarding remediation efforts in response to the 2019 Warning Letter, the 2021 10-K stated that "[t]he Company submitted its initial response to the FDA Warning Letter on March 28, 2019 and provides regular progress reports to the FDA as to its corrective actions and, since the conclusion of the inspection, has undertaken significant efforts to remediate the observations and continues to do so."

### April 8, 2022 Proxy Statement

157.    On April 8, 2022, the Company filed the 2022 Proxy Statement. Defendants De Witte, Essig, Baillintyn, Bradley, Clay, Hill, Morel, Murphy, and Schade solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

158.    The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants De Witte, Bradley, Clay, Essig, Hill, Morel, Murphy, and Schade to the Board; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"); and (3) approve executive compensation on an advisory basis.

159.    In discussing the Company's Code of Conduct, the 2022 Proxy Statement stated that "Integra is committed to its Code of Conduct and to holding the Company accountable as a leader in the medical technology industry. The Company operates a comprehensive compliance program, which is supported by a training program led by Integra's Chief Compliance Officer."

160.    In discussing the "Board's Role in Risk Oversight," the 2022 Proxy Statement stated the following:

> The Board of Directors has overall responsibility for the oversight of risk management at the Company and has delegated responsibility for the oversight of certain areas of risk management to the standing Committees of the Board, as

described below. Each standing Board committee reports to the full Board following each committee meeting. . . .

The Board is committed to oversight of the Company's business strategy and strategic planning, including through the work of the Board committees and regular Board meetings. This ongoing effort enables the Board to focus on Company performance over the short, intermediate and long term. In addition to financial and operational performance, non-financial measures, including diversity and sustainability goals, are addressed by the Board and Board committees.

The Company has also implemented an Enterprise Risk Management ("ERM") program to further enhance its oversight of risks inherent to the business. This ERM program allows the Board and management to gain a greater understanding and awareness of risks facing the business and to mitigate those risks.

In addition to periodic updates management provides to the Board on the ERM program, management presents an annual report to the Board detailing the Company's processes for (1) assessing and addressing risks, (2) compliance reporting, and (3) the reporting of other material information.

Our President and Chief Executive Officer, who functions as our chief risk officer, has responsibility for ensuring management provides periodic updates to the Board or Board committees regarding risks in many areas, among them accounting, treasury, information systems, legal, governance, legislative (including reimbursement), general compliance (including sales and marketing compliance), quality, regulatory, sustainability, environment, social and governance ("ESG") risks and opportunities, corporate development, operations and sales and marketing. Both formal reports and less formal communications between the Board and our President and Chief Executive Officer derive from a continual flow of communication throughout the Company regarding risk and compliance. We believe our Board and senior management team promote a culture that actively identifies and manages risk.

The ERM program, along with our annual processes for creating and reviewing with the Board our strategic plan, budget and internal audit plans, as well as regular processes and communications throughout the Company, including between management and the Board and Board committees, combine to ensure the Company is continually addressing its business risks in a disciplined fashion.

161.    Defendants De Witte, Essig, Baillintyn, Bradley, Clay, Hill, Morel, Murphy, and Schade caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of

SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; and (5) the Company did not have effective risk oversight mechanisms in place. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

162.    The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

163.    As the result of Defendants De Witte, Essig, Baillintyn, Bradley, Clay, Hill, Morel, Murphy, and Schade causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants De Witte, Bradley, Clay, Essig, Hill, Morel, Murphy, and Schade to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve executive compensation on an advisory basis.

### *April 27, 2022 Form 10-Q*

164.    On April 27, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of the 2022 Fiscal Year (the "Q1 2022 10-Q"). The Q1 2022 10-Q was

signed by Defendants De Witte, Anderson, and Mosebrook and attached SOX certifications signed by Defendants De Witte and Anderson attesting to the accuracy of the Q1 2022 10-Q.

165.    In discussing the remediation efforts of the Boston Facility in the wake of the 2019 Warning Letter and the 2021 Form 483, and the respective effect these efforts would have on the Company's business, the Q1 2022 10-Q stated:

> The Company submitted its initial response to the FDA Warning Letter on March 28, 2019 and provides regular progress reports to the FDA as to its corrective actions and, since the conclusion of the inspection, ***has undertaken significant efforts to remediate the observations and continues to do so***. On October 28, 2021 the FDA initiated an inspection of the facility and at the conclusion of the inspection issued a FDA Form 483 on November 12, 2021 (the "2021 Form 483"). The Company provided an initial response to the inspection observations and will continue to provide responses to FDA. ***The Warning Letter and the 2021 FDA Form 483 do not restrict the Company's ability to manufacture or ship products or require the recall of any products, nor do they restrict our ability to seek FDA 510(k) clearance of products.***

### July 27, 2022 Form 10-Q

166.    On July 27, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of the 2022 Fiscal Year (the "Q2 2022 10-Q"). The Q2 2022 10-Q was signed by Defendants De Witte, Anderson, and Mosebrook and attached SOX certifications signed by Defendants De Witte and Anderson attesting to the accuracy of the Q2 2022 10-Q.

167.    In discussing the remediation efforts of the Boston Facility in the wake of the 2019 Warning Letter and the 2021 Form 483, and the respective effect these efforts would have on the Company's business, the Q2 2022 10-Q repeated the same statement as the Q1 2022 10-Q. *Supra* ¶ 165.

### September 30, 2022 ESG Report

168.    On September 30, 2022, the Company issued its first ever "Environmental, Social & Governance (ESG) Report" for the 2021 Fiscal Year (the "2021 ESG Report"). The 2021 ESG

Report highlighted how the Company's "deep commitment" to manufacturing high quality and safe medical technology that was fully compliant with regulatory requirements. The 2021 ESG Report stated, *inter alia*, that "[w]e have numerous mechanisms and processes embedded within our business operations to protect and ensure product quality, continuously improve the effectiveness of our quality management system, and ensure compliance with all regulatory requirements." Further, the 2021 ESG Report specifically stated that "Integra adheres to good manufacturing practices (GMPs), [and] quality system regulations (QSRs)."

### *October 26, 2022 Form 10-Q*

169.    On October 26, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of the 2022 Fiscal Year (the "Q3 2022 10-Q"). The Q3 2022 10-Q was signed by Defendants De Witte, Anderson, and Mosebrook and attached SOX certifications signed by Defendants De Witte and Anderson attesting to the accuracy of the Q3 2022 10-Q.

170.    In discussing the remediation efforts of the Boston Facility in the wake of the 2019 Warning Letter and the 2021 Form 483, and the respective effect these efforts would have on the Company's business, the Q3 2022 10-Q repeated the same statement as the Q1 2022 10-Q. *Supra* ¶ 165.

### *February 22, 2023 Form 10-K*

171.    On February 22, 2023, the Company filed its annual report on Form 10-K for the 2022 Fiscal Year with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants De Witte, Mosebrook, Essig, Bradley, Clay, Hill, Lo, Morel, Murphy, and Schade and attached SOX certifications signed by Defendants De Witte and Mosebrook attesting to the accuracy of the 2022 10-K.

172.    In discussing the remediation of the Boston Facility, the 2022 10-K stated that "[t]he Company submitted its initial response to the FDA Warning Letter on March 28, 2019 and provides regular progress reports to the FDA as to its corrective actions and, since the conclusion of the inspection, has undertaken significant efforts to remediate the observations and continues to do so."

173.    The 2022 10-K also downplayed the 2021 Form 483 and the 2019 Warning Letter, stating that "[t]he Warning Letter and the 2021 FDA Form 483 do not restrict the Company's ability to manufacture or ship products or require the recall of any products, nor do they restrict our ability to seek FDA 510(k) clearance of products."

### *April 6, 2023 Proxy Statement*

174.    On April 6, 2023, the Company filed its Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants De Witte, Essig, Bradley, Clay, Hill, Lo, Morel, Murphy, and Schade solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

175.    The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants De Witte, Bradley, Clay, Essig, Hill, Lo, Murphy, and Schade to the Board; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"); (3) approve executive compensation on an advisory basis; and (4) approve the frequency of future votes on executive compensation on an advisory basis.

176.    In discussing the Company's Code of Conduct, the 2023 Proxy Statement stated the following:

> Integra is committed to its Code of Conduct and to holding the Company accountable as a leader in the medical technology industry. The Company operates

a comprehensive compliance program, which is supported by a training program led by Integra's Chief Compliance Officer. Our comprehensive Code of Conduct reflects our expectation of compliance with laws, regulations, and codes of ethics relevant to our industry around the world. This Code of Conduct is on the Integra website and applies to all individuals and organizations that are suppliers to or third-party intermediaries for Integra. It establishes minimum requirements and expectations for the conduct of Integra's business partners, and Integra encourages its partners to establish stricter or more extensive requirements where appropriate.

177.    In discussing the "Board's Role in Risk Oversight," the 2023 Proxy Statement stated the following:

> The Board has overall responsibility for the oversight of risk management at the Company, which includes overseeing our process for identifying, assessing and mitigating significant financial, operational, strategic, cybersecurity and other risks that may affect the Company. A fundamental part of risk oversight is understanding the risks that Integra faces, the steps management is taking to manage those risks, and assessing the Company's appetite for risk. The risk assessment process also considers whether risks are short-, medium-, or long-term, such that the management of significant risks can be prioritized, in part, based on the timeframe of such risks. Risk management systems, including our internal auditing procedures, internal control over financial reporting and corporate compliance programs, are designed in part to inform management about our material risks. Our Board receives regular reports from management on matters relating to strategic and operational initiatives, financial performance, cybersecurity and legal developments, including the related enterprise-risk exposures. The involvement of the Board in the oversight of our strategic planning process is a key part of its assessment of the risks inherent in our corporate strategy.

> The Board has delegated responsibility for the oversight of certain areas of risk management to the standing Committees of the Board, as described below. Each standing Board committee reports to the full Board following each committee meeting. . . .

> The Board is committed to oversight of the Company's business strategy and strategic planning, including through the work of the Board committees and regular Board meetings. This ongoing effort enables the Board to focus on Company performance over the short, intermediate and long term. In addition to financial and operational performance, non-financial measures, including diversity and sustainability goals, are addressed by the Board and Board committees.

> The Company has also implemented an Enterprise Risk Management ("ERM") program to further enhance its oversight of risks inherent to the business. This ERM program allows the Board and management to gain a greater understanding and awareness of risks facing the business and the efforts being undertaken to mitigate

those risks. Additionally, the executive leadership team's individual performance objectives are aligned with the top risks identified in the annual ERM process.

In addition to periodic updates management provides to the Board on the ERM program, management presents an annual report to the Board detailing the Company's processes for (1) assessing and addressing risks, (2) compliance reporting, and (3) the reporting of other material information.

Our President and Chief Executive Officer, who functions as our chief risk officer, is supported in this role by both our Chief Legal Officer and our Chief Compliance Officer, who reports to our Chief Legal Officer. As chief risk officer, our President and Chief Executive Officer has responsibility for ensuring management provides periodic updates to the Board or Board committees regarding risks in many areas, among them accounting, treasury, information systems, legal, governance, legislative (including reimbursement), general compliance (including sales and marketing compliance), quality, regulatory, sustainability, ESG risks and opportunities, corporate development, operations and sales, marketing and cybersecurity. Both formal reports and less formal communications between the Board and our President and Chief Executive Officer derive from a continual flow of communication throughout the Company regarding risk and compliance. We believe our Board and senior management team promote a culture that actively identifies and manages risk.

The ERM program, along with our annual processes for creating and reviewing with the Board our strategic plan, budget and internal audit plans, as well as regular processes and communications throughout the Company, including between management and the Board and Board committees, combine to ensure the Company is continually addressing its business risks in a disciplined fashion.

178.    Defendants De Witte, Essig, Bradley, Clay, Hill, Lo, Morel, Murphy, and Schade caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; and (5) the Company did not have effective risk oversight mechanisms in place. As a

result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

179.    The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

180.    As the result of Defendants De Witte, Essig, Bradley, Clay, Hill, Lo, Morel, Murphy, and Schade causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants De Witte, Bradley, Clay, Essig, Hill, Lo, Murphy, and Schade to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) approve executive compensation on an advisory basis; and (4) approve the frequency of future votes on executive compensation on an advisory basis.

### *April 26, 2023 Earnings Call*

181.    On April 26, 2023, the Company hosted an earnings call with investors and analysts to discuss the financial results for the first quarter of the 2023 Fiscal Year (the "Q1 2023 Earnings Call"). During the Q1 2023 Earnings Call, Defendant De Witte again told investors that the issues identified by the FDA were being remediated, stating that the Company has "been working for the "past couple of years to upgrade [the] Boston [F]acility based on FDA observations in 2018 and

2021," and that the Company "had an audit early in March that confirms we're on the right track with our execution."

### April 26, 2023 Form 10-Q

182.    On April 26, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of the 2023 Fiscal Year (the "Q1 2023 10-Q"). The Q1 2023 10-Q was signed by Defendants De Witte and Mosebrook and attached SOX certifications signed by Defendants De Witte and Mosebrook attesting to the accuracy of the Q1 2023 10-Q.

183.    In discussing the remediation efforts of the Boston Facility in the wake of the 2019 Warning Letter and the 2021 Form 483, and the respective effect these efforts would have on the Company's business, the Q1 2023 10-Q repeated the same statement as the Q1 2022 10-Q. *Supra* ¶ 165.

### May 4, 2023 Analyst/Investor Day

184.    On May 4, 2023, the Company hosted an Analyst/Investor Day. During the 2023 Analyst/Investor Day, Defendant Leonard highlighted the Company's work toward making the Boston Facility compliant, stating that "[l]ast year and this year, we made significant investments in quality across all of our manufacturing sites with a focus on accelerating our quality project in Boston involving testing, infrastructure, and physical layout changes."

185.    Defendant Leonard also highlighted the Company's production of biologic mesh products, stating that "the relocation of our Boston facility to a new PMA-ready site in nearby Braintree will more than double our capacity for SurgiMend and PriMatrix in 2025."

### July 27, 2023 Earnings Call

186.    On July 27, 2023, the Company hosted an earnings call with investors and analysts to discuss its financial results for the second quarter of the 2023 Fiscal Year (the "Q2 2023

Earnings Call"). On the Q2 2023 Earnings Call, Defendant De Witte again informed investors that the Company had no set backs in its remediation efforts at the Boston Facility, stating that "we have no specific indications of any product complaints related to high endotoxin levels," that "[p]atient safety is non-negotiable" for the Company, and that the Company was "highly focused on our remediation efforts" and "fully expect[ed] to complete the remediation."

### *July 27, 2023 Form 10-Q*

187.    On July 27, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of the 2023 Fiscal Year (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendants De Witte, Knight, and Mosebrook and attached SOX certifications signed by Defendants De Witte and Knight attesting to the accuracy of the Q2 2023 10-Q.

188.    In discussing the Company's remediation efforts at the Boston Facility and the supposed impact it would have on the FDA's findings, the Q2 2023 10-Q stated:

> On March 1, 2023, the FDA commenced an inspection of the Boston facility, and issued an FDA Form 483 at the conclusion of this inspection (the "2023 Form 483"). On July 19, 2023, TEI received a Warning Letter, dated July 17, 2023, from the FDA related to quality system issues at the TEI Boston facility (the "2023 Warning Letter"). The 2023 Warning Letter did not identify any new observations that had not already been provided in the 2023 Form 483. The Company submitted an initial response to the 2023 Form 483 to the FDA and is in the process of preparing a written response to the 2023 Warning Letter. *We are committed to resolving the matters identified in the Warning Letters and Form 483s and are continuing our significant efforts to remediate the observations. Although the Warning Letters and the Form 483s do not restrict our ability to manufacture or ship products or require the recall of any products*, in May 2023, after consultation with the FDA, the Company initiated a voluntary recall of products manufactured in the Boston facility distributed between March 1, 2018 and May 22, 2023, and extended the temporary halt of manufacturing at the facility to implement additional detection and quality controls. *Following implementation of such controls, the Company expects to resume manufacturing at its Boston facility by late in the fourth quarter of 2023. Additionally, the Warning Letters do not restrict the Company's ability to seek FDA 510(k) clearance of products*. . . .

### *August 17, 2023 ESG Report*

189.     On August 17, 2023, the Company filed its Environmental, Social and Governance Report for the 2022 Fiscal Year (the "2022 ESG Report"). The 2022 ESG Report continued to highlight the Company's compliance efforts and improvements to the quality systems, stating that "product safety and quality are paramount" to Integra and that the Company "continuously improve[s] our Quality Management System (QMS) to meet the highest and most current quality standards." The 2022 ESG Report further stated that "[t]o avoid defects and deliver the highest-quality products, Integra also adheres to Good Manufacturing Practices (GMPs), [and] Quality System Regulations (QSRs)."

### *September 6, 2023 Wells Fargo Securities Healthcare Conference*

190.     On September 26, 2023, Defendant Knight represented the Company in a presentation at the Wells Fargo Securities Healthcare Conference. In response to a question regarding the Company's production and the Recall, Defendant Knight informed investors that the "Boston remediation continues to progress well" and that the Company "hired in the right technical expertise to support and drive building a remediation plan and executing against it… ***we are absolutely on the right path, that our timelines to get back into market are real.***"

191.     Defendant Knight further stated that the Company was set to "begin manufacturing again in the end of this year and that commercial distribution would resume somewhere in the mid to late Q2 2024 timeline."

### *October 25, 2023 Earnings Call*

192.     On October 25, 2023, the Company hosted an earnings call with investors and analysts to discuss its financial results for the third quarter of the 2023 Fiscal Year (the "Q3 2023 Earnings Call"). On the Q3 2023 Earnings Call, Defendant De Witte discussed the progress the Company was making in its remediation of the Boston Facility, stating that "***our progress in***

*addressing the Boston facility and returning to the market remains on track.* Interim external reviews **confirm the adequacy of our remediation plan** and the changes made so far and they **reflect significant steps made towards the resumption of manufacturing by the end of the fourth quarter 2023 and commercial distribution in mid- to late second quarter '24**." Later in the Q3 2023 Earnings Call, Defendant De Witte again stated that "we are on track with our communicated timeline."

### October 25, 2023 Form 10-Q

193.    On October 25, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of the 2023 Fiscal Year (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendants De Witte, Knight, and Mosebrook and attached SOX certifications signed by Defendants De Witte and Knight attesting to the accuracy of the Q3 2023 10-Q.

194.    In discussing the Company's remediation efforts at the Boston Facility and the supposed impact it would have on the FDA's findings, the Q3 2023 10-Q repeated the same statements as the Q2 2023 10-Q. *Supra* ¶ 188.

195.    The statements in ¶¶117-156, 164-173, 181-194 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; and (5) the Company did not have effective risk oversight mechanisms in place. As a result of the foregoing, the Company's statements about its

business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Starts Emerging as False and Misleading Statements Continue**

### *February 28, 2024 Press Releases*

196.    On February 28, 2024, the Company issued a press release that announced that Defendant De Witte had informed the Board of his intent to retire at the end of 2024.

197.    Also on February 28, 2024, the Company published a press release announcing its financial results for the fourth quarter and year-end of the 2023 Fiscal Year (the "FY 2023 Earnings Release"). The FY 2023 Earnings Release revealed disappointing financial results, reporting that the 2023 earnings were finally impacted by the persisting issues at the Boston Facility. Among the disappointing results were: (1) a reported 7.7% decline in adjusted earnings per share due to spending reductions; (2) a 62% decline in GAAP net income; (3) an 11.7% decline in adjusted net income due to product returns and an unfavorable mix of lost revenue and remediation costs; and (4) a 24% decline in adjusted EBITDA margins due to the Recall.

198.    The FY 2023 Earnings Release also revealed disappointing guidance for the first quarter and full year of the 2024 Fiscal Year, namely an anticipated decline in revenue from 5.5% to 4.1% in the first quarter and reductions that are attributable to the cessation of new orders for private label products manufactured at the Boston Facility.

199.    In an attempt to downplay the negative results, the FY 2023 Earnings Release reiterated that the remediation efforts were continuing on schedule, with an expectation that "[r]elaunch remains on track for mid-to-late Q2 2024."

### *February 28, 2024 Earnings Call*

200.    That same day, the Company hosted an earnings call with investors and analysts to

discuss the fourth quarter and year-end results (the "FY 2023 Earnings Call").

201.    During the FY 2023 Earnings Call, Defendant De Witte shed some light on the disappointing financial results, stating that "[t]he Boston recall weighed on our financial results for the year."

202.    During her own remarks on the FY 2023 Earnings Call, Defendant Knight went into additional detail with the impact the Recall had on the Company's financial results, stating that:

> The second theme was the impact of the Boston recall, which drove significant operational challenges in 2023. Our full year revenues were $1.542 billion, down approximately 1% on a reported basis, with organic growth flat for the year and within our guidance range communicated in October. The Boston recall represented an approximate $67 million headwind to our reported revenues.

203.    On this news, the price of the Company's stock fell $5.60 per share, or approximately 12.6%, from a close of $44.27 per share on February 27, 2024, to close at $38.67 per share on February 28, 2024. However, the Individual Defendants continued to obfuscate the truth about the ongoing compliance issues at the Boston Facility.

204.    For example, on the FY 2023 Earnings Call, Defendant De Witte again reiterated to investors that the reopening of the Boston Facility remained on schedule, stating:

> So on Boston, just as a reminder, we restarted that factory in November and then in January had an external review, which we call the dress rehearsal. ***I call it a successful dress rehearsal because what we got were the confirmations,*** but also the learnings that we hoped to get based on the work done and its guidance, the learnings have been guiding us since the end of January over February into the preparation for that external audit, which will take place in March.
>
> The audits pretty much cover every aspect of our quality management system, I mean, from beginning to end. ***We got, I would say, limited observations on things that we could have improved.*** . . .
>
> And that's why we called it a dress rehearsal. Part of successful audit is not just having your quality management system processes documentation where it needs

to be. It's also making sure that in the question and answering with the auditors, you make sure that all that work is readily visible.

205.    During the FY 2023 Earnings Call, Defendant De Witte also stated that a "[s]uccessful audit will allow us to start building finished goods inventory to resume distribution mid- to late second quarter."

***February 28, 2024 Form 10-K***

206.    Also on February 28, 2024, the Company issued its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants De Witte, Knight, Mosebrook, Essig, Bradley, Clay, Graves, Hill, Lo, Murphy, and Schade and attached SOX certifications signed by Defendants De Witte and Knight attesting to the accuracy of the 2023 10-K.

207.    In discussing the Recall of the products that were produced at the Boston Facility, the 2023 10-K stated that "in May 2023, after consultation with the FDA, we initiated a voluntary global recall of all products manufactured in our Boston, Massachusetts facility distributed between March 1, 2018 and May 22, 2023."

208.    The 2023 10-K continued to soften the impact that the Recall and the remediation efforts at the Boston Facility had on the Company, stating that the Company had undertaken "remediation efforts" for the Boston Facility and that there were "expectations regarding the resumption of commercial distribution of products manufactured at the Boston facility."

209.    In discussing the efforts the Company was taking to remediate the 2023 Form 483 and the 2023 Warning Letter from the FDA, the 2023 10-K stated that:

> On March 1, 2023, the FDA commenced an inspection of the Boston facility, and issued an FDA Form 483 at the conclusion of this inspection (the "2023 Form 483"). In May 2023, after consultation with the FDA, the Company initiated a voluntary recall of products manufactured in the Boston facility distributed between March 1, 2018 and May 22, 2023, and extended the temporary halt of

manufacturing at the facility to implement additional detection and quality controls. On July 19, 2023, TEI received a Warning Letter, dated July 17, 2023, from the FDA related to quality system issues at the Boston facility (the "2023 Warning Letter"). The 2023 Warning Letter did not identify any new observations that had not already been provided in the 2023 Form 483. The Company has submitted an initial response to the FDA for both the 2023 Form 483 and the 2023 Warning Letter. ***We committed to resolving the matters identified in the Warning Letters and Form 483s and are continuing our significant efforts to remediate the observations***.s

210.    The statements in ¶¶199, 204-09 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; and (5) the Company did not have effective risk oversight mechanisms in place. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 4, 2024 Proxy Statement*

211.    On April 4, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants De Witte, Essig, Bradley, Clay, Graves, Hill, Lo, Murphy, and Schade solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

212.    The 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Bradley, Clay, De Witte, Essig, Graves, Hill, Lo, Murphy, and Schade to the Board; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve executive

compensation on an advisory basis; (4) approve an amendment to the Company's Certificate of Incorporation reflecting the new Delaware Law provisions regarding officer exculpation; and (5) approve the 2024 Amendment to the Equity Incentive Plan.

213.    The 2024 Proxy Statement noted that if Integra shareholders approved the 2024 Amendment to the Equity Incentive Plan, it would increase the number of shares available for issuance under the Equity Incentive Plan by 1,900,000. According to the 2024 Proxy Statement, as of March 13, 2024, there were 1,697,176 shares remaining available for issuance under the Equity Incentive Plan. The 2024 Proxy also states that the addition of available shares under the Equity Incentive Plan would allow the Company to continue issuing shares for a period of two to three years.

214.    In discussing the Company's Code of Conduct, the 2024 Proxy Statement stated the following:

> Integra is committed to its Code of Conduct and to holding the Company accountable as a leader in the medical technology industry. The Company operates a comprehensive compliance program, which is supported by a training program led by Integra's Chief Compliance Officer. Our comprehensive Code of Conduct reflects our expectation of compliance with laws, regulations, and codes of ethics relevant to our industry around the world. This Code of Conduct is on the Integra website and applies to all individuals and organizations that are suppliers to or third-party intermediaries for Integra. It establishes minimum requirements and expectations for the conduct of Integra's business partners, and Integra encourages its partners to establish stricter or more extensive requirements where appropriate.

215.    In discussing the "Board's Role in Risk Oversight," the 2024 Proxy Statement stated the following:

> The Board has overall responsibility for the oversight of risk management at the Company, which includes overseeing our process for identifying, assessing and mitigating significant financial, operational, strategic, cybersecurity and other risks that may affect the Company. A fundamental part of risk oversight is understanding the risks that Integra faces, the steps management is taking to manage those risks, and assessing the Company's appetite for risk. The risk assessment process also considers whether risks are short-, medium-, or long-term, such that the

management of significant risks can be prioritized, in part, based on the timeframe of such risks. Risk management systems, including our internal auditing procedures, internal control over financial reporting and corporate compliance programs, are designed in part to inform management about our material risks. Our Board receives regular reports from management on matters relating to strategic and operational initiatives, financial performance, cybersecurity and legal developments, including the related enterprise-risk exposures. The involvement of the Board in the oversight of our strategic planning process is a key part of its assessment of the risks inherent in our corporate strategy.

The Board has delegated responsibility for the oversight of certain areas of risk management to the standing Committees of the Board, as described below. Each standing Board committee reports to the full Board following each committee meeting. . . .

The Board is committed to oversight of the Company's business strategy and strategic planning, including through the work of the Board committees and regular Board meetings. This ongoing effort enables the Board to focus on Company performance over the short, intermediate and long term. In addition to financial and operational performance, non-financial measures, including diversity and sustainability goals, are addressed by the Board and Board committees.

The Company has also implemented an Enterprise Risk Management ("ERM") program to further enhance its oversight of risks inherent to the business. This ERM program allows the Board and management to gain a greater understanding and awareness of risks facing the business and the efforts being undertaken to mitigate those risks. Additionally, the executive leadership team's individual performance objectives are aligned with the top risks identified in the annual ERM process.

In addition to periodic updates management provides to the Board on the ERM program, management presents an annual report to the Board detailing the Company's processes for (1) assessing and addressing risks, (2) compliance reporting, and (3) the reporting of other material information.

Our President and Chief Executive Officer, who functions as our chief risk officer, is supported in this role by both our Chief Legal Officer and our Chief Compliance Officer, who reports to our Chief Legal Officer. As chief risk officer, our President and Chief Executive Officer has responsibility for ensuring management provides periodic updates to the Board or Board committees regarding risks in many areas, among them accounting, treasury, information systems, legal, governance, legislative (including reimbursement), general compliance (including sales and marketing compliance), quality, regulatory, sustainability, ESG risks and opportunities, corporate development, operations and sales, marketing and cybersecurity. Both formal reports and less formal communications between the Board and our President and Chief Executive Officer derive from a continual flow of communication throughout the Company regarding risk and compliance. We

believe our Board and senior management team promote a culture that actively identifies and manages risk.

The ERM program, along with our annual processes for creating and reviewing with the Board our strategic plan, budget and internal audit plans, as well as regular processes and communications throughout the Company, including between management and the Board and Board committees, combine to ensure the Company is continually addressing its business risks in a disciplined fashion.

216.    Defendants De Witte, Essig, Bradley, Clay, Graves, Hill, Lo, Murphy, and Schade caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; (5) the Company did not have effective risk oversight mechanisms in place; and (6) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2024 Amendment to the Equity Incentive Plan. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

217.    The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

218. As the result of Defendants De Witte, Essig, Bradley, Clay, Graves, Hill, Lo, Murphy, and Schade causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Bradley, Clay, De Witte, Essig, Graves, Hill, Lo, Murphy, and Schade to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve executive compensation on an advisory basis; (4) approve an amendment to the Company's Certificate of Incorporation reflecting the new Delaware Law provisions regarding officer exculpation; and (5) approve the 2024 Amendment to the Equity Incentive Plan.

219. As the result of the shareholders voting to approve the 2024 Amendment to the Equity Incentive Plan, an additional 1,900,000 shares were made available under the plan to employees and non-employee directors of the Company. The Individual Defendants, including many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Amendment to the Equity Incentive Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Equity Incentive Plan in the future.

### *May 6, 2024 Press Release*

220. On May 6, 2024, the Company issued a press release announcing its financial results for the first quarter of the 2024 Fiscal Year (the "Q1 2024 Earnings Release"). The Q1 2024 Earnings Release brought more negative news for the Company, as it was announced the Company's full year adjusted earnings per share guidance would be decreased again to a range of

$3.01 to $3.11 per share, a decrease from the initial $3.15 to $3.20 per share, as well as below the analysts' consensus estimate of $3.19 per share.

### May 6, 2024 Earnings Call

221. That same day, the Company hosted an earnings call with analysts and investors to discuss the first quarter results (the "Q1 2024 Earnings Call"). During he Q1 2024 Earnings Call, it was revealed the shutdown of the Boston Facility would be extended by an additional seven months, with Defendant De Witte stating that "[b]ased on our preliminary assessment, we no longer expect to resume commercial distribution in 2024." This extension would bring the total shutdown time of the Boston Facility past the year and a half mark.

222. In explaining the reduction in earnings per share guidance, Defendant De Witte explained that it "reflect[s] the delay of the relaunch of SurgiMend and PriMatrix."

223. On this news, the price of the Company's stock fell $5.75 per share, or approximately 19.9%, from a close of $28.89 per share on May 5, 2024, to close at $23.14 per share on May 6, 2024. However, the Individual Defendants continued to obfuscate the truth about the ongoing compliance issues at the Boston Facility.

### May 6, 2024 Form 10-Q

224. For example, on May 6, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of the 2024 Fiscal Year (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendants De Witte, Knight, and Mosebrook and attached SOX certifications signed by Defendants De Witte and Knight attesting to the accuracy of the Q1 2024 10-Q.

225. In discussing the Company's remediation efforts at the Boston Facility and the supposed impact it would have on the FDA's findings, the Q1 2024 10-Q repeated the same statements as the Q2 2023 10-Q. *Supra* ¶ 188.

226.    The Q1 2024 10-Q also announced that "[f]ollowing implementation of upgraded Good Laboratory Practices and expertise and a standardization of corrective and preventative action processes and governance, the Company resumed manufacturing at its Boston facility in the fourth quarter of 2023."

227.    Thus, the statements identified in ¶¶ 224-226 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results. Specifically, the Registration Statement contained false and/or misleading statements and/or failed to disclose that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; (5) the Company did not have effective risk oversight mechanisms in place; and (6) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2024 Amendment to the Equity Incentive Plan. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Fully Emerges

### July 29, 2024 Press Release

228.    The truth did not fully emerge until July 29, 2024, when the Company issued the Q2 2024 Earnings Release. The Q2 2024 Earnings Release revealed that there were cGMP deficiencies and shipping holds identified within not just the Boston Facility, but in fact *all* of the

Company's facilities. The Q2 2024 Earnings Release further revealed that, in order to combat the compliance deficiencies, the Company would be "[i]mplementing compliance master plan to address quality system and GMP compliance learnings. As a result, the company has initiated temporary shipping holds on certain products that will primarily impact the third quarter."

### *July 29, 2024 Form 10-Q*

229.    That same day, the Company filed the Q2 2024 10-Q. The Q2 2024 10-Q provided further details of the Company's "master plan," stating that while the plan was initially implemented at the Boston Facility, it would be expanded to the Company's entire network of facilities, with the implementation expected to last through 2025. In full, the Q2 2024 10-Q stated:

> In Q2 2024, we initiated the planning of a Compliance Master Plan (the "CMP"), a systematic and holistic approach to improving our quality system and Good Manufacturing Practice ("GMP") compliance for the Boston/Braintree sites. While the initial planning has been implemented for the Boston/Braintree sites, the CMP will be expanded across our manufacturing and supply network in the coming months to ensure we can sustain compliance and enable our product supply to match our customer demand. We expect the CMP implementation and engagement to last through 2025.

### *July 29, 2024 Earnings Call*

230.    Also on July 29, 2024, the Company hosted an earnings call with investors and analysts to discuss the financial results (the "Q2 2024 Earnings Call"). During the Q2 2024 Earnings Call, even more information regarding the "master plan" was provided, with Defendant Essig admitting that it was "clear that there is a need to bolster our manufacturing quality compliance processes across the organization" and that management was finally "giving these issues the attention they deserve."

231.    In addition, during the Q2 2024 Earnings Call, Defendant Knight explained how the implementation of the "master plan," as well as the subsequent shipping holds, would impact the Company's financials. Defendant Knight stated that the expectation was a reduction in

forecasted revenues "in the range of $1.609 billion to $1.629 billion," a reduction of approximately $90 million.

232.    On this news, the price of the Company's stock fell $6.01 per share, or approximately 19.1%, from a close of $31.43 per share on July 28, 2024, to close at $25.42 per share on July 29, 2024.

## DAMAGES TO INTEGRA

233.    As a direct and proximate result of the Individual Defendants' misconduct, Integra has lost and will continue to lose and expend many millions of dollars.

234.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

235.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

236.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

237.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

238.    As a direct and proximate result of the Individual Defendants' conduct, Integra has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

239.    Plaintiff brings this action derivatively and for the benefit of Integra to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Integra, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Anderson, Arduini, Coleman, Davis, De Witte, Knight, Leonard, and Mosebrook.

240.    Integra is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

241.    Plaintiff is, and has been at all relevant times, a shareholder of Integra. Plaintiff will adequately and fairly represent the interests of Integra in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

242.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

243.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Integra's Board consisted of the following nine individuals: Defendants Bradley, Clay, Essig, Graves, Hill, Lo, Murphy, and Schade (the "Director-Defendants") and non-party Mojdeh

Poul (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time this action was filed.

244. Demand is further excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants again unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

245. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

246. Additional reasons that demand on Defendant Bradley is futile follow. Defendant Bradley has served as a director of the Company since 1992. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee and Finance Committee. Defendant Bradley has received and continues to receive handsome compensation for his role as a director. Defendant Bradley solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Clay, Essig, Hill, Morel, Murphy, Schade, and himself to the Board,

allowing them to continue breaching their fiduciary duties to the Company. Defendant Bradley also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Clay, Essig, Hill, Lo, Murphy, Schade, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Bradley also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Clay, De Witte, Essig, Graves, Hill, Lo, Murphy, Schade, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Amendment to the Equity Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, as a Company director, Defendant Bradley signed the false and misleading 2019, 2020, 2021, 2022, and 2023 10-Ks. Moreover, under the 2024 Amendment to the Equity Incentive Plan, Defendant Bradley is eligible to receive stock awards under the 2024 Amendment to the Equity Incentive Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the Equity Incentive Plan. For these reasons too, Defendant Bradley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

247.    Additional reasons that demand on Defendant Clay is futile follow. Defendant Clay has served as a director of the Company since 2021. She also serves as a member of the Audit Committee. Defendant Clay has received and continues to receive handsome compensation for her role as a director. Defendant Clay solicited the 2022 Proxy Statement, which contained false and

misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Essig, Hill, Morel, Murphy, Schade, and herself to the Board, allowing them to continue breaching their fiduciary duties to the Company. Defendant Clay also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Essig, Hill, Lo, Murphy, Schade, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Clay also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bradley, De Witte, Essig, Graves, Hill, Lo, Murphy, Schade, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Amendment to the Equity Incentive Plan. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, as a Company director, Defendant Clay signed the false and misleading 2021, 2022, and 2023 10-Ks. Moreover, under the 2024 Amendment to the Equity Incentive Plan, Defendant Clay is eligible to receive stock awards under the 2024 Amendment to the Equity Incentive Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the Equity Incentive Plan. For these reasons too, Defendant Clay breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

248.    Additional reasons that demand on Defendant Essig is futile follow. Defendant Essig has served as a director of the Company since 1997, and as the Company's Executive Chairman since 2012. Defendant Essig also serves the Chair of the Quality Committee. Defendant

Essig has received and continues to receive handsome compensation for his role as a Executive Chairman. Defendant Essig solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Clay, Hill, Morel, Murphy, Schade, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company. Defendant Essig also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Clay, Hill, Lo, Murphy, Schade, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Essig also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bradley, Clay, De Witte, Graves, Hill, Lo, Murphy, Schade, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Amendment to the Equity Incentive Plan. As a trusted, long-time Company director and Executive Chairman, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, as a Executive Chairman, Defendant Essig signed the false and misleading 2019, 2020, 2021, 2022, and 2023 10-Ks. Moreover, under the 2024 Amendment to the Equity Incentive Plan, Defendant Essig is eligible to receive stock awards under the 2024 Amendment to the Equity Incentive Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the Equity Incentive Plan. Further, Defendant Essig's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. For these reasons too, Defendant Essig breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

249.   Additional reasons that demand on Defendant Graves is futile follow. Defendant Graves has served as a director of the Company since 2023. He also serves as a member of the Compensation Committee. Defendant Graves has received and continues to receive handsome compensation for his role as a director. Defendant Graves also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bradley, Clay, De Witte, Essig, Hill, Lo, Murphy, Schade, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Amendment to the Equity Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, as a Company director, Defendant Graves signed the false and misleading 2023 10-K. Moreover, under the 2024 Amendment to the Equity Incentive Plan, Defendant Graves is eligible to receive stock awards under the 2024 Amendment to the Equity Incentive Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the Equity Incentive Plan. For these reasons too, Defendant Graves breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

250.   Additional reasons that demand on Defendant Hill is futile follow. Defendant Hill has served as a director of the Company since 2013. She also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Hill has received and continues to receive

handsome compensation for her role as a director. Defendant Hill solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Clay, Essig, Morel, Murphy, Schade, and herself to the Board, allowing them to continue breaching their fiduciary duties to the Company. Defendant Hill also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Clay, Essig, Lo, Murphy, Schade, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Hill also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bradley, Clay, De Witte, Essig, Graves, Lo, Murphy, Schade, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Amendment to the Equity Incentive Plan. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, as a Company director, Defendant Hill signed the false and misleading 2019, 2020, 2021, 2022, and 2023 10-Ks. Moreover, under the 2024 Amendment to the Equity Incentive Plan, Defendant Hill is eligible to receive stock awards under the 2024 Amendment to the Equity Incentive Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the Equity Incentive Plan. For these reasons too, Defendant Hill breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

251.    Additional reasons that demand on Defendant Lo is futile follow. Defendant Lo has served as a Company director since 2022. She also serves as a member of the Compensation Committee. Defendant Lo has received and continues to receive handsome compensation for her role as a director. Defendant Lo also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Clay, Essig, Hill, Murphy, Schade, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Lo also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bradley, Clay, De Witte, Essig, Graves, Hill, Murphy, Schade, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Amendment to the Equity Incentive Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, as a Company director, Defendant Lo signed the false and misleading 2022 and 2023 10-Ks. Moreover, under the 2024 Amendment to the Equity Incentive Plan, Defendant Lo is eligible to receive stock awards under the 2024 Amendment to the Equity Incentive Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the Equity Incentive Plan. For these reasons too, Defendant Lo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

252.    Additional reasons that demand on Defendant Murphy is futile follow. Defendant Murphy has served as a Company director since 2009. He also serves as a member of the Audit

Committee. Defendant Murphy has received and continues to receive handsome compensation for his role as a director. Defendant Murphy solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Clay, Essig, Hill, Morel, Schade, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company. Defendant Murphy also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Clay, Essig, Hill, Lo, Schade, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Murphy also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bradley, Clay, De Witte, Essig, Graves, Hill, Lo, Schade, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Amendment to the Equity Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, as a Company director, Defendant Murphy signed the false and misleading 2019, 2020, 2021, 2022, and 2023 10-Ks. Moreover, under the 2024 Amendment to the Equity Incentive Plan, Defendant Murphy is eligible to receive stock awards under the 2024 Amendment to the Equity Incentive Plan, thereby materially benefiting from the adoption of the 2024 Amendment to the Equity Incentive Plan. Further, Defendant Murphy's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. For these reasons too, Defendant Murphy breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

253.    Additional reasons that demand on Defendant Schade is futile follow. Defendant Schade has served as a Company director since 2006. He also serves as the Chair of the Audit Committee and the Finance Committee. Defendant Schade has received and continues to receive handsome compensation for his role as a director. Defendant Schade solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Clay, Essig, Hill, Morel, Murphy, and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company. Defendant Schade also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants De Witte, Bradley, Clay, Essig, Hill, Lo, Murphy, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Schade also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bradley, Clay, De Witte, Essig, Graves, Hill, Lo, Murphy, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, as well as the approval of the 2024 Amendment to the Equity Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, as a Company director, Defendant Schade signed the false and misleading 2019, 2020, 2021, 2022, and 2023 10-Ks. Moreover, under the 2024 Amendment to the Equity Incentive Plan, Defendant Schade is eligible to receive stock awards under the 2024 Amendment to the Equity Incentive Plan,

thereby materially benefiting from the adoption of the 2024 Amendment to the Equity Incentive Plan. Further, Defendant Schade's insider sale made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. For these reasons too, Defendant Schade breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

254.    Additional reasons that demand on the Board is futile follow.

255.    Defendants Clay, Murphy, and Schade (as Chair) (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

256.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust

enrichment, abuse of control, gross mismanagement, and for waste of corporate assets. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

257.    Integra has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Integra any part of the damages Integra suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

258.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

259.    The acts complained of herein constitute violations of fiduciary duties owed by Integra's officers and directors, and these acts are incapable of ratification.

260.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Integra. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Integra, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

261. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Integra to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

262. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

263. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

264. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

265.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

266.    Defendants De Witte, Essig, Baillintyn, Bradley, Clay, Hill, Morel, Murphy, and Schade caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; and (5) the Company did not have effective risk oversight mechanisms in place. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

267.    Under the direction and watch of Defendants De Witte, Essig, Baillintyn, Bradley, Clay, Hill, Morel, Murphy, and Schade, the 2022 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of

Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

268.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

269.    As the result of Defendants De Witte, Essig, Baillintyn, Bradley, Clay, Hill, Morel, Murphy, and Schade causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants De Witte, Bradley, Clay, Essig, Hill, Morel, Murphy, and Schade to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve executive compensation on an advisory basis.

270.    The Company was damaged as a result of Defendants De Witte's, Essig's, Baillintyn's, Bradley's, Clay's, Hill's, Morel's, Murphy's, and Schade's, material misrepresentations and omissions in the 2022 Proxy Statement.

271.    Defendants De Witte, Essig, Bradley, Clay, Hill, Lo, Morel, Murphy, and Schade caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that:

(1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; and (5) the Company did not have effective risk oversight mechanisms in place. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

272.    Under the direction and watch of Defendants De Witte, Essig, Bradley, Clay, Hill, Lo, Morel, Murphy, and Schade, the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

273.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

274.    As the result of Defendants De Witte, Essig, Bradley, Clay, Hill, Lo, Morel,

Murphy, and Schade causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants De Witte, Bradley, Clay, Essig, Hill, Lo, Murphy, and Schade to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) approve executive compensation on an advisory basis; and (4) approve the frequency of future votes on executive compensation on an advisory basis.

275. The Company was damaged as a result of Defendants De Witte's, Essig's, Bradley's, Clay's, Hill's, Lo's, Morel's, Murphy's, and Schade's, material misrepresentations and omissions in the 2023 Proxy Statement.

276. Defendants De Witte, Essig, Bradley, Clay, Graves, Hill, Lo, Murphy, and Schade caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; (5) the Company did not have effective risk oversight mechanisms in place; and (6) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2024 Amendment to the Equity Incentive Plan. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

277. Under the direction and watch of Defendants De Witte, Essig, Bradley, Clay,

Graves, Hill, Lo, Murphy, and Schade, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

278.   In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of the Company's directors and the approval of the 2024 Amendment to the Equity Incentive Plan.

279.   As the result of the shareholders voting to approve the 2024 Amendment to the Company's Equity Incentive Plan, an additional 1,900,000 shares were made available under the plan to employees and non-employee directors of the Company. The Individual Defendants, including many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Amendment to the Equity Incentive Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Equity Incentive Plan in the future.

280.   The Company was damaged as a result of Defendants De Witte's, Essig's,

Bradley's, Clay's, Graves's, Hill's, Lo's, Murphy's, and Schade's material misrepresentations and omissions in the 2024 Proxy Statement.

281.    Plaintiff, on behalf of Integra, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

282.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

283.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Integra's business and affairs.

284.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

285.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Integra.

286.    In breach of their fiduciary duties owed to Integra, the Individual Defendants willfully or recklessly caused the Company caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was failing to make meaningful efforts to address cGMP deficiencies at its Boston Facility; (2) the Company was failing to comply with cGMPs in its manufacturing of SurgiMend, PriMatrix, and other extracellular bovine matrix ("EBM") products; (3) the Company did not have proper internal controls to ensure compliance with cGMPs; (4) the Company's cGMP violations negatively impacted the Company's ability to manufacture EBM products at its Boston Facility; (5) the Company did not have effective risk oversight mechanisms in place; and (6) the Individual

Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2024 Amendment to the Equity Incentive Plan. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

287. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

288. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

289. In yet further breach of their fiduciary duties, while shares of its Company common stock were trading at artificially inflated prices before the fraud was exposed, six of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $41.8 million.

290. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Integra's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

291.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

292.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Integra has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

293.    Plaintiff, on behalf of Integra, has no adequate remedy at law.

### THIRD CLAIM
### Against Individual Defendants for Unjust Enrichment

294.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

295.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Integra.

296.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Integra that was tied to the performance or artificially inflated valuation of Integra, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

297.    Plaintiff, as a shareholder and a representative of Integra, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

298.    Plaintiff, on behalf of Integra, has no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Abuse of Control

299.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

300.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Integra, for which they are legally responsible.

301.    As a direct and proximate result of the Individual Defendants' abuse of control, Integra has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Integra has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

302.    Plaintiff, on behalf of Integra, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Gross Mismanagement

303.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

304.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Integra in a manner consistent with the operations of a publicly held corporation.

305.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Integra has sustained and will continue to sustain significant damages.

306. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

307. Plaintiff, on behalf of Integra, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

308. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

309. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

310. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Integra to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

311. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

312. Plaintiff, on behalf of Integra, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Anderson, Arduini, Coleman, Davis, De Witte, Knight, Leonard, and Mosebrook for Contribution Under Sections 10(b) and 21D of the Exchange Act

313. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

314. Integra and Defendants Anderson, Arduini, Coleman, Davis, De Witte, Knight, Leonard, and Mosebrook are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange

Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Anderson's, Defendant Arduini's, Defendant Coleman's, Defendant Davis's, Defendant De Witte's, Defendant Knight's, Defendant Leonard's, and Defendant Mosebrook's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

315.    Defendants Anderson, Arduini, Coleman, Davis, De Witte, Knight, Leonard, and Mosebrook, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

316.    Accordingly, Defendants Anderson, Arduini, Coleman, Davis, De Witte, Knight, Leonard, and Mosebrook are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

317.    As such, Integra is entitled to receive all appropriate contribution or indemnification from Defendants Anderson, Arduini, Coleman, Davis, De Witte, Knight, Leonard, and Mosebrook.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Integra, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Integra;

(c)    Determining and awarding to Integra the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Integra and the Individual Defendants to take all necessary actions to reform and improve Integra's corporate governance and internal procedures to comply with applicable laws and to protect Integra and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Integra to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Integra restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and

proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: March 6, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth J. Donohoe*
Elizabeth J. Donohoe
Zachary M. Benson
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
        zbenson@thebrownlawfirm.net
        tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Bob Seth, as Trustee of the Trust of Aman Bob Seth, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Integra LifeSciences Holdings Corporation common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of _____ 2025.

<span>3/5/2025</span>

Signed by:

Aman Bob Seth

BF4132FCD8DE4E6

_____

Bob Seth